(62 Misc. Rep. 189.)

### FULTON LIGHT, HEAT & POWER CO. et al. v. STATE.

(Court of Claims of New York.   January, 1909.)

**1. STATES (§ 1*)—ACTIONS—RULES OF LAW APPLICABLE.**

The general rule is that the state is to be governed in its controversies in court by the same principles of law that apply as between individuals.

[Ed. Note.—For other cases, see States, Dec. Dig. § 1.*]

**2. PUBLIC LANDS (§ 163*)—GRANTS BY STATE—CONSTRUCTION.**

The rule construing a grant by the state strictly against the grantee does not apply to a grant of real estate where there is a consideration.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 163.*]

**3. BOUNDARIES (§ 15*)—GRANT OF LANDS BORDERING ON—OWNERSHIP OF BED OF STREAM.**

A grant by the state of land bordering on a nontidal stream, though navigable in fact, carries title to its center and the riparian rights incident thereto unless reserved; such reservation, if not an express one, to be determined by the language of the grant in the light of the presumption which favors an extension to the center of the stream.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 108–117; Dec. Dig. § 15.*]

**4. NAVIGABLE WATERS (§ 1*)—DEFINED.**

The term "navigable" at common law and in a legal sense means a stream in which the tide ebbs and flows, and the fact that a river is quite a large one and capable of furnishing considerable water power does not change the rule, nor does the fact that the river may in certain portions of it be a navigable stream in fact, for that merely affects the question of the public right to transportation over it.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 5–16; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 5, pp. 4675–4684; vol. 8, p. 7728.]

**5. NAVIGABLE WATERS (§ 39*)—IMPROVEMENT OF CHANNELS AND STREAMS.**

The riparian rights of the owner of the upland on a tide-water stream or on a nontidal stream, navigable in fact, are subject to the paramount right of the state and federal government to improve navigation and regulate commerce.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 21; Dec. Dig. § 39.*]

**6. NAVIGABLE WATERS (§ 7*)—IMPROVEMENT OF CHANNELS AND STREAMS.**

The construction of a barge canal cannot be held within the reserved power of the state to improve a river for navigation, where something entirely apart from the river, except as it may be necessary to obtain from it an additional supply of water.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 18; Dec. Dig. § 7.*]

**7. BOUNDARIES (§ 49*)—DISPUTED LINE—PRACTICAL LOCATION.**

The doctrine of practical location may be resorted to where the exact location of the line bounding state property, as shown on a map introduced, appropriated for a canal, has not been established, and in addition other maps have been filed which are at variance with such line.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 243–248; Dec. Dig. § 49.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**8. NAVIGABLE WATERS (§ 37*)—RIGHT TO GRANT LANDS UNDER WATERS—"NAVIGABLE RIVERS."**

Laws 1786, p. 334, c. 67, permitting the commissioners of the land office to grant land under "navigable rivers" as they might deem necessary to promote the commerce of the state, provided the grant should be made to the adjacent owner, is only applicable to a tidal stream and does not extend to a nontidal stream, though in fact navigable.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–227; Dec. Dig. § 37.*]

**9. PUBLIC LANDS (§ 163*)—PATENTS—CONSTRUCTION.**

It was not usual and is not customary in grants by the state to include the acreage of an adjoining stream as a part of the acreage of the land conveyed.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 163.*]

**10. EMINENT DOMAIN (§ 84*)—RIGHT TO TAKE WATER WITHOUT COMPENSATION.**

Where the state owns the bed of a river and its water, it can abstract the water for canal purposes without compensation.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 227; Dec. Dig. § 84.*]

**11. BOUNDARIES (§ 13*)—BOUNDARIES ON WATER COURSES.**

Where land is bounded by or on a nontidal stream, the presumption is that the title extends to the center of the stream, and this presumption exists even against the state, where the conveyance is for a consideration, and there is nothing to indicate that the state intended to except the bed of the stream.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 95–101; Dec. Dig. § 13.*]

**12. BOUNDARIES (§ 13*)—BOUNDARIES ON WATER COURSES—CONSTRUCTION.**

In construing the conveyance of land upon a stream or body of water, more liberality must be allowed in interpreting the language of the conveyance because of the difficulty of locating the bounds of such land except by marks upon the shore of the stream, and as ordinarily no monument can be placed in the center of the stream.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 95–101; Dec. Dig. § 13.*]

**13. BOUNDARIES (§ 15*)—CONSTRUCTION.**

A description in a grant by the state beginning at a sapling standing on the shore of the Oswego river and, after giving several courses, running back to the river, and then up along the same, to the place of beginning, carries title to the center of the river.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 108–117; Dec. Dig. § 15.*]

**14. ADVERSE POSSESSION (§ 7*)—LANDS OF STATE.**

Title may be acquired to lands under the water in a navigable river as against the state by adverse possession after a period of 40 years, and where within that period it has not received rents or profits.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 24–42; Dec. Dig. § 7.*]

**15. NAVIGABLE WATERS (§ 44*)—RIGHT TO ACCRETION.**

Whether or not the title of a riparian owner stands to the center of a stream, it being a nontidal, nonboundary stream, any land which may have been reclaimed from the bed of the river on its becoming lower may be occupied by him so long as he does not interfere with the improvement of the river for navigation.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 266–282; Dec. Dig. § 44.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Claim by the Fulton Light, Heat & Power Company and another against the State for damages to property situated on the Oswego river taken by the State for a canal. Finding for claimants that they were the owners in fee of the land sought to be condemned and of the riparian rights attached thereto.

Hugo Hirsh (Charles A. Collin, John P. Wells, W. D. Gaillard, G. C. Warner, Geo. J. Gillespie, N. R. Holmes, F. B. Hunt, James T. Clark, and R. H. Goldsborough, of counsel), for claimants.

George P. Decker, Deputy Atty. Gen., and M. H. Quirk, Asst. Atty. Gen., for the State.

RODENBECK, J. This is a proceeding taken by the state to acquire title to certain property alleged to be owned by the claimants situated on the Oswego river at the city of Fulton. Part of the property is located at the east end of what is known as the "State Dam at Fulton," a dam constructed for furnishing a supply of water to the Oswego canal; and other portions of the property are located northerly therefrom, but bordering upon the Oswego river. The so-called power plant property is used by the claimants as a power station for the development of electricity for which it finds a market in the city of Fulton and elsewhere. It uses as a means for developing electricity part of the time the water of the Oswego river, which is held back at this point by the dam above mentioned constructed by the state in connection with the Oswego Canal. This canal was completed about the year 1826 and opened into the Oswego river at the dam in question; the backwater of the dam furnishing a supply for the operation of the canal. In 1857 the state improved the Oswego Canal by extending it southerly from the said State Dam. Since the original construction of the canal in 1826, the state has continued, down to the present time, to operate it as a part of the canal system of the state, and now proposes to improve it still further by the construction of an enlarged canal. This canal is being constructed along the margin of the Oswego river at the point in question, and to acquire the property necessary the state has served notice of appropriation upon the claimants. Three notices have been served, affecting three separate parcels of land owned by them. One is known as the power plant station, and is located at the dam; another is called the Kenyon Mills property, and is a short distance north from the power plant station; and the third is the Genesee Mills property located still farther north. In two of these notices, the state not only describes the land which it deems necessary, but provides for the taking of the riparian rights of the owners. The state now challenges the ownership of the claimants, not only of the riparian rights which it specified, but of the land itself which it specifically describes. The position of the state in a general way, so far as the title of the claimants is concerned, is: That the original patent of the land on the Oswego river at this point does not extend to the center of the river; that the claimants have no land or riparian rights with which the state is interfering; and that, if this position is incorrect, the land and riparian rights sought to be condemned were actually ac-

quired by the state in the course of the construction of the Oswego Canal, and there is nothing to appropriate. This main contention and its subordinate propositions have been so earnestly and industriously urged by the learned Deputy Attorney General that it has been deemed necessary to examine at considerable length the various arguments advanced in support of his position.

At the very outset of the case, the proposition was urged that the usual rules for the interpretation of a conveyance between individuals, where the conveyance was of property on the bank of a water course, did not apply to the state, and that all patents by the state must be construed favorably to the state. It was argued that the usual presumption of ownership to the middle of a nontidal stream, which applies in the case of a conveyance by an individual, did not extend to the state, and that no riparian rights were attached to a patent of upland made by the state, unless they were in express terms included in the language of the patent. It is necessary to consider this preliminary proposition before undertaking to interpret the language of the patent through which claimants derived their title. In examining this question it must be borne in mind that the general rule is that the state is to be governed in its controversies in court by the same principles of law that apply as between individuals. The state cannot be sued without its consent, and it has imposed certain limitations upon its right to be sued; but when it is fairly in court it is to be judged by the same rules which it has laid down for the settlement of disputes in court between its own citizens. People v. Canal Board, 55 N. Y. 395; People v. Stephens, 71 N. Y. 537. The general rule for the construction of grants by the state, where there is a valuable consideration, does not differ from that which applies to grants by individuals. Certain grants by the state are construed strictly against the grantee, but this rule does not apply to grants of real estate by the state where there is a consideration.

The construction of state grants is discussed in Langdon v. Mayor, 93 N. Y. 148, where, after discussing various cases on the subject, Judge Earl says:

"We have thus sufficiently referred to authorities as to the rule for the construction of public grants. It will be seen that the common law is recognized in this country, which requires all grants by the sovereign of exclusive privileges and franchises and all gratuitous grants of land should be strictly construed against the grantee, but that the same strict rule of construction should not be applied to grants of land made for a valuable and adequate consideration paid or agreed to be paid by the grantee."

Where the grant is in the nature of a patent of land by the state given for military services, there is an adequate consideration for the grant, and the rule above laid down applies. Such a patent is not only a grant of real property, which would take it out of the exception to the general rule above mentioned, but it is based upon a sufficient consideration so that it is to be construed the same as if it were a grant between individuals. It is in no sense a grant of an exclusive privilege and franchise, or a gratuitous grant, or a grant of rights which are vested in the public at large, and is therefore to be construed against the state rather than against the grantee. Rights which

the state holds in trust for the public use, such as the supervision of public highways and the control of navigable waters, are inalienable; but lands owned by the state bordering upon a stream or land under the water of a stream, whether it is a tide-water stream or not, is a mere right of property and not a prerogative of the sovereign, and can be disposed of by the state as if owned by an individual, according to the laws relating thereto, and when transferred the grant is to be construed like any other conveyance of real property. In deciding this case therefore the state is governed by the same rules of law as would apply were the contest one between individuals, instead of a controversy in which the state is involved as a party. Varick v. Smith, 5 Paige, 136, 28 Am. Dec. 417 (1835); Id., 9 Paige, 558 (1842); Van Buren v. Baker, 12 N. Y. St. Rep. 211; Gere v. McChesney, 84 App. Div. 40, 82 N. Y. Supp. 191.

The foregoing relates to the general rules applicable in the courts where the state is a party, and there still remains the inquiry as to what specific rules of interpretation apply to the conveyance to the claimants and their predecessors, in determining whether or not their title extends to the center of the Oswego river. In determining this question as applicable to this case, it should be noted at the outset that the decisions of other states upon this point are of little value, for each jurisdiction is a law unto itself as to the rights of riparian owners, and the different state courts have not ruled consistently upon this phase of the case. The United States Supreme Court has held that, with regard to grants by the government of land bordering on tide water, the title to the shore and land under water in front of land so granted inures to the state within which they are situated, but that the extent to which this prerogative of the state over land under water of such a stream extends depends upon the law of each state. Hardin v. Jordan, 140 U. S. 381, 11 Sup. Ct. 808, 35 L. Ed. 428. All of the parties concerned in this case concede that, so far as tide water is concerned, the title of a grant of land upon the shore extends only to high-water mark; but it is contended by the learned Deputy Attorney General that the common-law rule which carries the title of a grant on a nontidal stream to the center of the stream does not apply in this state, but that the question as to the interpretation of such a grant must be decided by the size and usage of the stream.

The rule which he invokes would be a rather uncertain guide for interpreting the title to land under water and would require the reversal of the settled law of the state. The decisions of the courts upon this question in the early history of the state are not entirely consistent, and the common-law rule which prevailed in England was not always adhered to; but the current of decisions in recent years has been uniform in adopting the common-law rule, with but a single exception, relating to streams or bodies of water which form boundaries between the state and other states or countries. It has been uniformly held that grants of land on the Hudson river, which is a tide-water stream, in the absence of express language covering the bed of the stream, carried the title only to high-water mark, and that the bed of the river remained in the state until expressly granted. Palmer v.

Mulligan, 3 Caines, 307, 2 Am. Dec. 270; Gould v. H. R. R. Co., 6 N. Y. 522; People v. Tibbetts, 19 N. Y. 523; Mayor v. Starin, 106 N. Y. 19, 12 N. E. 631; Langdon v. Mayor, 93 N. Y. 145; Sage v. Mayor, 154 N. Y. 79, 47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592; Knickerbocker Ice Co. v. Shultz, 116 N. Y. 388, 22 N. E. 564; Rumsey v. N. Y. & N. E. R. R. Co., 114 N. Y. 427, 21 N. E. 1066. The same doctrine has been applied to Great South Bay, where the tide ebbs and flows (People ex rel. Howell v. Jessup, 160 N. Y. 260, 54 N. E. 682), and to the Connecticut river, a tidal stream (Smith v. Bartlett, 180 N. Y. 365, 73 N. E. 63).

The first cases interpreting grants on tide-water streams held that the owner of the land bordering on the stream had title to high-water mark, and that he had no claim even to a right of access to the stream (Gould v. H. R. R. Co., 6 N. Y. 522); but later cases changed this rule and extended the right of riparian owners upon tide waters farther than the common-law rule in such cases. The doctrine laid down in the Gould Case was overruled in Rumsey v. N. Y. & N. E. R. R. Co., 114 N. Y. 427, 21 N. E. 1066, which held that a riparian owner on the Hudson river, a tidal stream, had a right of access to the stream which could not be cut off without making compensation to him; and in the cases of People ex rel. Howell v. Jessup, 160 N. Y. 260, 54 N. E. 682, and Town of Brookhaven v. Smith, 188 N. Y. 74, 80 N. E. 665, 9 L. R. A. (N. S.) 326, the rights of riparian owners on tide waters were still farther extended. These cases show that the courts have not followed strictly the common-law rule as to tidal streams, but that in the case of tide waters they have extended rather than narrowed the rights of riparian owners; so that it may be said to be the law of this state that the rights of the owner of the land bounding a tidal stream include not only a "right of access to the navigable part of the river in front of riparian lands for the purpose of loading boats, drawing nets and the like" (Sage v. Mayor, 154 N. Y. 61, 47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592), but the right to erect and use a suitable wharf or pier from his land into the water, provided he does not interfere with public navigation (Town of Brookhaven v. Smith, 188 N. Y. 74, 80 N. E. 665, 9 L. R. A. [N. S.] 326). In the case of nontidal streams the common-law rule was that the owner of the land on the stream of common right had the title to the bed of the stream to its center. This rule has been adhered to in recent years by the courts, with a single exception relating to boundary streams or bodies of water. In the following cases the effect of the rule has been accomplished, whether the result was attained by a construction based upon the common-law right of ownership, or upon the presumption arising from a grant, or from the interpretation of the language of the grant itself: Commissioners v. Kempshall, 26 Wend. 404; Varick v. Smith, 5 Paige, 136, 28 Am. Dec. 417; Id., 9 Paige, 547; Chenango Bridge Co. v. Paige, 83 N. Y. 178, 38 Am. Rep. 407; Smith v. City of Rochester, 92 N. Y. 463, 44 Am. Rep. 393; Gouverneur v. National Ice Co., 134 N. Y. 355, 31 N. E. 865, 18 L. R. A. 695, 30 Am. St. Rep. 669; Waller v. State, 144 N. Y. 579, 39 N. E. 680; Neal v. City of Rochester, 156 N. Y. 213, 50 N. E. 803.

The only exception to the common-law rule made in this state, as already remarked, is in the case of boundary streams or lakes separating the state from other states or countries. Champlain R. R. Co. v. Valentine, 19 Barb. 484; Matter Commissioners State Reservation at Niagara, 37 Hun, 537. The cases involving the Mohawk river, which is not a tidal stream, are not exceptions to the common-law rule, since, in the case of the Mohawk river, there was a reservation of the title of the stream and bed of the stream in the state. Canal Appraisers v. People, 17 Wend. 571; People v. Canal Appraisers, 33 N. Y. 461; People v. Page, 39 App. Div. 110, 56 N. Y. Supp. 834, 58 N. Y. Supp. 239. The rule deducible from these cases as to nontidal streams is that the title to the bed and the riparian rights incident thereto go with the ownership of the land bounding the stream, unless reserved; such reservation, if not an express one, to be determined by the language of the grant or conveyance, in the light of the presumption which favors an extension to the center of the stream of the title of the land bounding the stream, with the exception of boundary streams and bodies of water which, like Niagara river and Lake Champlain, require an express grant from the state to give title.

In examining the cases confusion will result, unless it is borne in mind that the term "navigable," at common law and in a legal sense, means a stream where the tide ebbs and flows; and it must always be kept in mind that, whatever may be the rights of the owner of the upland in the bed of a navigable stream, whether the term "navigable" be used in its legal sense or as used in common speech, these rights are always subject to the paramount right of the state and the federal government to improve navigation and regulate commerce. We have nothing to do in this case with the rule applicable to tide-water streams, for it is conceded that the Oswego is not a tide-water stream. It is not a boundary stream, so that it does not come within the exception to the common-law rule above noted. Being neither a tide-water nor a boundary stream, it falls in the category of those streams a grant of land on the shore of which is presumed to carry title to the center of the stream. In determining this case therefore there may be eliminated all consideration of cases applicable to tide-water and boundary streams, and recourse must be had to authorities touching other streams and water courses. The fact that this river is quite a large one and is capable of furnishing at the point in question considerable water power does not change the rule; nor is the rule affected by the fact that the Oswego river may in certain portions of it be a navigable stream in fact, for its navigability in fact merely affects the question of the public right to transportation upon its surface. Morgan v. King, 35 N. Y. 458, 91 Am. Dec. 58.

The riparian rights of the owner of the upland on a tide-water stream, or on a nontidal stream which is navigable in fact, is subject to the paramount right of the state and federal governments to improve navigation and regulate commerce; and, as the learned Deputy Attorney General claims in this case that the construction of the barge canal is to be construed as an improvement of the Oswego river with-

in the reserved power of the state, it becomes necessary to pass upon this point before taking up the interpretation of the patent under which the claimants hold title, because, if this contention is correct, it is immaterial whether claimants own to the center of the river or not. This position of the state, however, is not a tenable one, as the construction of the barge canal at this point is something entirely apart from the Oswego river, except as it may be necessary to obtain from it an additional supply of water. It is not being built in the river and is a separate enterprise to be judged upon the same basis, so far as affecting private rights are concerned, as if it were an enterprise of a private corporation. On the plea of its sovereign right to improve navigation, the state cannot abstract water from the Oswego river for an entirely independent venture. There is no doubt but that the state might improve a stream navigable in fact by deepening its channel or removing obstructions, even those placed there by the owner of the bed of the stream; but upon the plea of improving navigation, and without interfering with the bed of the river at all, it cannot abstract water which it does not now own from the Oswego river and divert it from its natural channel to the injury of those owning riparian rights. In the construction of the Erie Canal, the state was held liable to make compensation for any land or water taken by it, except such water as was actually controlled by the state. Even if the state had riparian rights by reason of ownership of land upon the shore of the stream, it would not thereby secure the right to abstract water and thus injure other riparian owners. The state stands in the same situation as a riparian owner that an individual does, and can no more consume water, the right to the use of which it does not own, to the injury of riparian owners, than can an individual. The barge canal, although a great enterprise, stands upon the same footing as the Erie Canal, so far as riparian rights are concerned; and the state can acquire no private property, whether land or water, and can interfere with no private rights in the construction of the canal, without making compensation therefor. Waiving the question of the right of the state to interfere with the Oswego river at the point where it is not and has not been navigable in fact (Morgan v. King, 35 N. Y. 458, 91 Am. Dec. 58), there is no doubt that the construction of the canal does not come within the reserve power of the state to improve the navigation of the river. As was said in Commissioners of Canal Fund v. Kempshall, 26 Wend. 421:

"I cannot assent to the position that the conceded common-law authority of the state over such rivers for the purposes of navigation comprehends the right to divert the waters to other purposes of artificial navigation wholly distinct from that of the river itself. The right of a public navigable highway on a river, if it be susceptible of it, or capable of being made so, is an easement or servitude which, like other servitudes, public or private, is to be exercised without intrusion on the other proprietary rights, beyond what is necessary for its sovereignty as involving also an unlimited right to the use of the waters for other purposes of transportation in another direction and channel, would be in contradiction of an acknowledged principle of the law of easements (already stated), that nothing passes as incident to a servitude but what is needed for the sufficient enjoyment of the right 'itself.'"

The same principle is applied in Smith v. City of Rochester, 92 N. Y. 484, 44 Am. Rep. 393; Beidler v. Sanitary District, 211 Ill. 628, 71 N. E. 1118, 67 L. R. A. 820.

Before proceeding to interpret the patent granted by the state in this instance, it is necessary to examine another question raised by the state, namely, whether or not the land proposed to be taken was appropriated by the state for the Oswego Canal at the time of its original construction or at the time of its enlargement. If this contention is correct, whatever riparian rights the claimants acquired under the patent granted by the state were appropriated to the uses of the state when the Oswego Canal was built or enlarged, and they have long since lost any claim for compensation for such appropriation. This contention is based chiefly upon a map filed in 1834, showing the lands which had been appropriated by the state for the original Oswego Canal. This map shows an erasure of the blue line at the location of the power plant property, and the blue line which appears upon the map in place of the erased line, it is claimed by the state, embraces the property in question in this proceeding. Under the statutes under which the Oswego Canal was constructed, no map was required to be filed anterior to possession by the state of such real property as it deemed necessary for the construction of the canal. The state went into occupancy of such land as it deemed necessary, and later, in pursuance of the statutes, filed a map of the land which it claimed had been appropriated, which map the statute made presumptive evidence of the title of the state. It is urged by the claimants that this map should not be followed, because it does not comply with the statute requiring that the map shall show the boundaries of each parcel, the names of the former owners, and the date of each title. This map appears to have been made substantially in compliance with the statute, and it is too late to insist that the statute technically had not been complied with. The claimants' predecessors have had every opportunity to consult the map and ascertain to what extent their property was affected by the appropriation made by the state. This is not a case where the owners have not had an opportunity of knowing by actual staking out or by filing of a map what land was actually appropriated. The cases of Yaw v. State, 127 N. Y. 190, 27 N. E. 829, and Hayden v. State, 132 N. Y. 533, 30 N. E. 961, therefore do not apply. While the contention of the claimants, however, with reference to the validity of the map of 1834, is not sound, it does not appear, as contended by the state, that the lines on the map actually include the property sought to be appropriated in this proceeding.

Passing over the question of the erasure which appears upon the map of 1834 as affecting its reliability, and assuming the correctness of the blue line as shown on the map, it does not appear that the premises sought to be taken are within the blue line appearing upon the map. The blue line showing the westerly boundary of the canal north of the dam does not extend to the dam, nor is it prolonged westerly across the river so as to include the dam. If the state relies upon the blue line as showing the boundaries of its property, no assumption will be indulged in to so extend any existing blue line as to include

additional land. The line of the state property stops with the termination of the blue line. The map is to be accepted as showing the title of the state to land included within blue lines which actually appear upon the map and will not be taken to show the state's title to land which does not appear thus included. The blue lines on the west side of the river include access to the dam, but such access does not seem to have been included within blue lines on the easterly end of the dam, perhaps because there existed there a mill site which the state did not deem necessary to take in the construction of the original Oswego Canal. There is, however, another difficulty with the position of the state with reference to the map of 1834, namely, the impossibility of locating the blue line shown upon the map in relation to the property sought to be condemned. A former engineer of the state testified that, in surveying for some public improvement at this point, he was unable to locate the blue line in question; and, if a man skilled in his profession employed by the state is unable to do so, how is this court to determine where the line is merely by reference to the map of 1834? Its exact location has not been shown, and in addition, other maps have been filed which are at variance with the blue line as shown upon the map of 1834, as, for instance, the map of 1874 (Ex. 25), which shows a different location of the blue line from that of the map of 1834. According to the contention of the state, the blue line of the map of 1834 would pass through the power house station, the location of which has never been questioned.

Under these circumstances the doctrine of practical location may be resorted to in order to establish the disputed line. Sherman v. Kane, 86 N. Y. 72; Katz v. Kaiser, 154 N. Y. 298, 48 N. E. 532; Bell v. Hayes, 60 App. Div. 386, 69 N. Y. Supp. 898. The conclusion therefore is that the map of 1834 does not show the premises of the claimant as included within land appropriated by the state heretofore. This conclusion does not impair the title of the state to its canal land and is not at variance with the rule that no length of occupancy of canal land will give title to the trespasser. This rule is based upon the state's being able to establish the location of its property and does not extend to a case where the blue line is in doubt, in which case it is a matter of proof whether the piece of property belongs to the state or to a private individual. Where the location, however, of the blue line is known, no length of occupancy of property embraced within the blue line will give a title to an occupant. In this case, not only is it impossible, so far as the proofs show, to locate the blue line as it appears upon the map of 1834, but the blue line which actually appears upon the map does not include the premises here sought to be condemned, by reason of the failure to continue lines which appear upon the map so as to include them. In addition to what has been said, the state authorities, pursuant to the statutes, have filed maps upon which these proceedings are based, under which the premises in question are sought to be appropriated for the barge canal, indicating that the present engineering staff of the state did not consider these lands as embraced within the lands heretofore acquired by the state. The conclusion therefore upon this branch of the case is that the title of the

state under previous appropriations does not cover the land in this proceeding.

Another question raised by the learned Deputy Attorney General, which will require discussion before taking up the construction of the state's patent, is that with reference to the exception by the state of the portage around Oswego Falls. It is claimed by the state that this portage extended from a point considerably south of the premises in question to a point northerly therefrom, thus including the land appropriated. On the testimony of oral witnesses it appears that there existed a portage on the east bank of the Oswego river from above the Oswego Falls, which is south of the premises in question, down to a point below the rapids far north of the claimants' land. If this portage described by the witnesses is the one meant in the statute, it covered the premises sought to be condemned. A reading of the statute, however, shows that the portage did not include, necessarily, the land of the claimants; and subsequent acts of the state show conclusively that the statute was not interpreted by state officers to cover claimants' land. The reservation for a portage, contained in chapter 63, p. 733, of the Laws of 1784, covers a strip of land 10 chains wide and 20 chains above and below the Oswego Falls. The statute, it is true, is capable of another construction, namely, that the reservation began 20 chains above where the batteaux were usually taken out of the river and extended northerly 20 chains below where the batteaux were usually put into the river; but this construction does not accord with the interpretation placed upon the statute by the state itself. In Exhibit D there is a reference to a "short carrying place" at Oswego Falls, which is hardly the portage described by the state's witnesses; and in Exhibit B the Surveyor General, who had reported on the Stene patent long after the patent had been granted by the state, says that the use of the old portage would be superseded by a storehouse built on the edge of the falls, and that the principal landing places were on private property, and that the reasons which induced the making of the reservation no longer existed with equal force for its retention, indicating that at that time, which was in 1820, the portage which existed was outside the Stene patent, through which claimants derived their title. That this construction is correct is borne out by the report of Simeon De Witt, the Surveyor General, who certified in 1793 to the Governor and the Commissioners of the Land Office, in connection with the proposed grant to Stene, that "it is no part of land reserved to the use of the people of the state." Exhibit V. Finally, we find in the Van Wagenen patent, which is a grant of land immediately south and adjacent to the land granted by the Stene patent, a reservation of a portage which corresponds with the interpretation here placed upon the statute of 1784. The land described in the Van Wagenen patent, beginning on the east bank of the river, extends easterly, then, northerly, then westerly, then southerly to "land reserved to the use of the people of this state and at the said Oswego Falls," then passes around the reservation, back to the place of beginning. The land thus reserved in the Van Wagenen patent corresponds with the dimensions of the portage given in the statute of 1784, as here interpreted, namely,

10 chains wide and 40 chains long. It appears therefore from an examination of the statute of 1784, contemporaneous evidence, and the construction placed upon the statute by the state, that the portage reserved in the statute does not cover the premises sought to be taken.

A further contention is made by the state which, if sound, would make it unnecessary to interpret the Stene patent and claimants' chain of title, namely, that the state had, prior to the making of the patent to Conrad Stene, granted to the Western Inland Lock Navigation Company all the water of the Oswego river. If this position is sound, there were no riparian rights that the state could convey to Conrad Stene, for the statute creating the Western Inland Lock Navigation Company antedates the Stene patent. At the time it incorporated the Western Inland Lock Navigation Company, the state might have conveyed the bed of the Oswego river and all of the riparian rights in it, just as it granted to the company the beds of the Mohawk and Hudson rivers, for the state had not previously granted to any individual or company the bed and riparian rights of the Oswego river. The statute, however, does not grant to the company the bed of the Oswego river and its water. There is nothing in the statute to justify any such generous gift on the part of the state. The act was passed March 30, 1792 (Laws 1792, p. 316, c. 40), and incorporated two companies known as the Western and Northern Inland Lock Navigation Companies, one for the purpose of establishing navigation from the Hudson to Lake Champlain, and the other, with which we are here concerned, for the purpose of opening lock navigation from the Hudson river to Lake Ontario and Seneca Lake. The statute provides for the incorporation, the subscription to stock, and other details with which we are not interested in this case, and then enumerates the corporate powers of the company. It provides that the incorporators and their successors shall have perpetual succession and have the right to acquire, hold, and dispose of lands, rents, hereditaments, goods, chattels, and effects of what kind, nature, or quality soever, to the amount of $300,-000 each, to sue and be sued, to have a corporate seal, to make by-laws, ordinances, regulations, the power of condemnation after a failure to agree with the owner of such rights as the company might desire, and generally such powers as may be necessary to carry out the purposes of the act; but nowhere do we find in the act any grant to the companies of any land in the bed of the Oswego river, or any riparian rights in the river, except as may be inferred from the fact that the company was given the right to construct its canal along the Oswego river so far as it might deem it expedient to do so.

The statute gave the companies a certain length of time in which to construct their canals, and it is sufficient here to observe that the limitation ran against the company, so far as the Oswego river is concerned, at the place where these premises are located. This act was amended December 20, 1792, by chapter 8, p. 394, of the laws of that year, by which the northern company was vested with the land under the Mohawk and Hudson rivers which it deemed necessary to occupy for the purposes of constructing its canal, reserving, however, to the

state the right to all land under the water not so occupied to be appropriated as the Legislature should from time to time direct. There is nothing in this act granting any rights in the Oswego river. The act was again amended March 9, 1793, by chapter 49, p. 453, of the Laws of 1793; but the act contains nothing bearing upon the question here involved, namely, whether or not the state had granted to the Western Inland Lock Navigation Company the right to the water of the Oswego river and the land under the water. Various amendments were made to the statute, or affected it, but not in any respect pertinent to the present inquiry. Laws 1795, p. 582, c. 38, relates to the stock of the company and the inspection of its minutes. Laws 1796, p. 719, c. 61, relates to advances of money to the directors of the company and the loan of powder by public authorities. Laws 1797, p. 45, c. 36, relates to the financial relief of the company. Laws 1802, c. 97 (Laws 1801–04, p. 141), relates to the financial affairs of the company. Laws 1806, c. 77 (Laws 1804–06, p. 410), grants to the company an ·extension of time. Notwithstanding the leniency shown by the state to the companies and the relief afforded them from time to time, the affairs of the two companies did not prosper, etc., and finally, in 1808, by chapter 222 (Laws 1807–09, p. 406), the Western Inland Lock Navigation Company petitioned the Legislature to surrender the grant·made by the state west of the Oneida Lake, and the Legislature, by chapter 222, accepted the surrender and restored to the state all rights granted to the company west of Oneida Lake. The other rights retained by the company the canal commissioners were authorized by a later statute to acquire, whenever they deemed it expedient for the interests of the state. Laws 1847, p. 289, c. 262.

The history of the Western Inland Lock Navigation Company therefore shows that the company never became vested with any land under the water of the Oswego river, or with any of the water of the river, but merely acquired authority from the° state to construct a canal along a certain period of time, which condition was not complied with, and that later whatever rights had been granted reverted to the state. The state therefore had full authority at the time of the making of the Stene patent to grant to Stene the riparian rights attached to his upland; and, even if it had not, the subsequent acquisition by the state of the°grant made by it to the Western Inland Lock Navigation Company would inure to the benefit of Stene and his successors and correct any defect there might be in his title with reference to riparian rights. The state is to be governed in a court of equity by the same rules as apply to individuals, and no individual, under the language of the grant by the state, under the circumstances of this case, would be permitted to come in at this late day and claim that riparian rights, which would under the usual construction go with the Stene patent, it had no power to convey, where a few years after its conveyance it acquired the riparian rights in question. The doctrine of estoppel would operate to prevent the state from taking advantage of any such position and would vest in its grantee any rights which by a fair construction would go with its grant. Tefft v. Munson, 57 N. Y. 99.

The validity of the Stene patent as a conveyance of the bed of the river is attacked by the state on the ground that the statute required a special grant of land under water.  If this were true, it would be a strong circumstance to take into account in construing the Stene patent, but the statute in force at the time that the Stene patent was granted contained no such requirement.  There was a statute which permitted the Commissioners of the Land Office to grant land under the water of "navigable rivers" as they might deem necessary to promote the commerce of the state, provided that the grant should be made to the owner of the adjacent land.  Laws 1786, p. 334, c. 67.  Under this statute the conveyance could only have been made to Stene and his successors in title; but the term "navigable" as used in this statute has been held to mean a tidal stream, and it therefore has no application to this situation.  The statute upon which reliance is placed by the state provides that "lands under the water of navigable rivers" may be granted as the commissioners may deem necessary "to promote the commerce" of the state.  With reference to the use of the term "navigable" in this statute, Vice Chancellor Gridley said, in Varick v. Smith, 9 Paige, 556:

"I cannot think that the Legislature intended by this provision to declare that the doctrine of riparian ownership was applicable to rivers which were navigable in the most extended sense.  The common-law interpretation of the term 'navigable' had been settled.  It had received a construction by adjudication, and when applied to a river it meant a river where the tide ebbed and flowed, and by the principle of the common law the bed of such a stream belonged to the state."

It is also urged by the state that the land actually laid off to Stene covered more than he was authorized to take under the statute.  The patent gave him 200 acres, but a survey made for this trial shows that there are 208 acres in the upland, not counting the acreage in the Oswego river to the center thereof.  After the trial Engineer Breen submitted a statement giving the area as 218 acres, and Engineer Cushman in a like statement says that it is impossible "to determine accurately the original lines of the Stene location."  Considering the means available at the time that the Stent patent was made for measuring land, taking into account the character of the premises and the difficulty of making a survey, the comparatively small value of the land at the time, the changes that may have occurred in the channel of the stream, the fact that five acres of each 100 acres were reserved for highway purposes, no greater amount was granted to Stene than the statute allowed.  Deducting 10 acres for highways, Stene got 198 acres, instead of 200, according to one of the state's witnesses.  At the time that the Stene patent was made, the acreage of the upland was the determining factor in fixing the amount of land conveyed pursuant to the statute (Van Winkle v. Van Winkle, 184 N. Y. 203, 77 N. E. 33), as it was not usual and is not customary in grants to include the acreage of an adjoining stream as a part of the acreage of the land conveyed.

"It is a matter of common knowledge, in respect to lands bordering on streams and other bodies of water, that it is usual in surveys, when made, to so describe the uplands as to compute the number of acres

they contain, as generally in them, exclusive of the soil beneath, the water is mainly the value, and the quantity of the uplands embraced in a conveyance constitutes, in view of the situation, the basis for the measure of the consideration.". Gouverneur v. N. I. Co., 134 N. Y. 368, 31 N. E. 870, 18 L. R. A. 695, 30 Am. St. Rep. 669.

There has thus been disposed of all preliminary questions which affect claimants' title, and we come down to the main issue in the case as to whether or not the patent granted by the state to Conrad Stene in 1793, under which the claimants hold, carried his title to the center of the Oswego river. If it did carry title to the center of the river, and claimants have succeeded to that title, they are in possession of such riparian rights as have not been disposed of by them or their predecessors in title or as have not been acquired subsequently by the state. If the title does not go to the center of the river, but stops at the water's edge, and the state has reserved the river to itself, water and bed, unless they have acquired riparian rights by prescription, the state may use the water of the Oswego river without making compensation therefor to them at least. Where the state owns the bed of a river and its water, it can abstract the water for canal purposes according to the present state of our law, which this court is bound to follow. Canal Appraisers v. People, 17 Wend. 571; People v. Canal Appraisers, 33 N. Y. 461; People v. Page, 39 App. Div. 110, 56 N. Y. Supp. 834, 58 N. Y. Supp. 239.

We come now to the language of the Stene patent. By this instrument the state conveyed to Stene, by an instrument approved by the Commissioners of the Land Office, May 10, 1793, in accordance with the location made by the Surveyor General, March, 1793:

"All that certain tract of land situate in the county of Herkimer, on the east side of the Onondaga or Oswego river below the Falls; beginning at the northwest corner of a tract of one thousand four hundred and forty acres of land granted to Garrett H. Van Wagenen at a white ash sapling marked on the southerly side W. H. and on the northerly side O. S., standing on the east shore of said Oswego river, and running thence east forty-two chains, then north forty-five chains, then west forty-eight chains to the said river, and then up along the same to the place of beginning, containing two hundred acres. Together with all and singular the rights, hereditaments and appurtenances to the same belonging, or in any wise appertaining. Excepting and reserving to ourselves all gold and silver mines, and five acres of every hundred acres of the said tract of land for highways."

This is the language upon which we are called to say whether or not claimants' title extends to the center of the river, and which must be examined in the light of the decisions of the court construing similar language, considering such facts as surround the case. The patent, it will be observed, describes its starting point both by reference to the northwest corner of another tract of land south thereof and by reference to a white ash sapling standing "on the east shore" of the Oswego river. At the very outset therefore reference must be had to the patent made to Garrett H. Van Wagenen, which is the land referred to in the Stene patent. It is urged by the claimants that, while in the Stene patent the starting point is a white ash standing "on the east shore" of the Oswego river, the Van Wagenen patent ex-

tends to the center of the river, and that therefore the other starting point mentioned in the Stene patent, the "northwest corner" of the Van Wagenen patent, is in the center of the river. There seems to be no such difference in the starting point as claimed. The north and south lines of the Van Wagenen patent are not the same length; the north line being nearly three times as long as the south line. There is no description in the Van Wagenen patent carrying the title to the patent expressly to the center of the river. The language of the patent goes to the bank of the river, and nowhere do we find the center of the river mentioned as one of the boundaries of the patent in express terms. It is true that the portage reserved by the statute of 1784 is excepted from the Van Wagenen patent, and that this portage carried with it a title in the state to the center of the river. This fact does not aid claimants, as the title of the state to the center of the river depends upon the construction of the reservation in the Van Wagenen patent, just as the title to the river bed opposite the land granted to Van Wagenen depends upon the construction of the language of his grant. In construing the Stene patent therefore we are governed by the language of the patent which began at a white ash sapling standing "on the east shore of the river" and then proceeded "up along the same to the place of beginning." The question is: Does this language carry the grant to the center of the river?

In answering this question there must be borne in mind that the white ash sapling indicates the place of the south line, rather than the starting point of the description (Van Winkle v. Van Winkle, 184 N. Y. 203, 77 N. E. 33), and that the words "to the river" and "up along the same" distinguish the case from those cases where the description runs along the "shore" or to the "bank." Child v. Starr, 4 Hill, 369. As already remarked, the patent must be treated as a grant made by the state for a valuable consideration, and must be interpreted in the light of the same rules which apply to a conveyance of land with similar language and in like situation between individuals. In examining the cases we must also remember, as heretofore stated, that there is a presumption, except in the case of streams or bodies of water the title of which has been expressly reserved by the state, and except in the case of tide-water streams and bodies of water, that the title of the owner of the upland extends to the center of the stream. These propositions are abundantly supported by the adjudicated cases. It is unnecessary to review the course of litigation in this state involving riparian rights, and it will be sufficient merely to refer to a few cases supporting the doctrines heretofore advanced bearing upon streams of the character of the Oswego river. In the early cases there was a disposition at times to deviate from the common-law rule under which the owners of the upland held as of common right the title to the bed of nontidal streams. It was claimed that the situation in this country as to water courses was not the same as in England, where there were no large inland fresh-water streams or lakes. The courts, however, soon settled down to a uniform construction of such conveyances, and a reference to a few cases will be sufficient to illustrate the rule applicable to the present state of facts.

At common law the bed of a nontidal stream to its center belonged as of common right to the owner of the upland. The courts of this state have not gone as far as the common law holds; but there is a presumption in this state that, where land is bounded by or on a nontidal stream, the title extends to the center of the stream, and this presumption exists even against the state, where the conveyance is for a consideration, and there is nothing in the grant to indicate that the state intended to except the bed of the stream. While this presumption exists, there is always a question whether or not the conveyance intended to include the land to the center of the stream. In construing the conveyance of land upon a stream or body of water, more liberality must be allowed in interpreting the language of the conveyance because of the difficulty of locating the bounds of such land except by marks upon the shore of the stream. No monument can be placed in the center of the stream, ordinarily, and the cases construing conveyances upon public highways must be examined in the light of this difference. The general rule as laid down in Gerard is as follows:

"Land bounded, in general terms, by a small lake, pond or stream, above tide water, and not 'navigable' as so generally understood, is not bounded by the bank, but by the middle of the stream, unless otherwise specified (subject to its use by the public as a highway), and the grantee has a right to use the land and water in any way not inconsistent with the public easement." Gerard, Titles of Real Estate, 515.

In Mott v. Mott, 68 N. Y. 246, 252, the court says:

"When lands are granted bounded upon a highway or a stream not navigable, unless by the terms of the grant, or by necessary implication, the highway or the bed of the stream are excluded, a title will pass to the center of the highway or stream."

In Canal Commissioners v. People, 5 Wend. 423, 444, we find the following language:

"If the grant is bounded on the stream or along the same, or on the margin thereof, or where any other words of similar import are used, the grant legally extends to the middle or thread of the stream; and not only the bank but the bed of the river and the islands therein * * * are conveyed to the grantee, unless they are expressly reserved, or the terms of the grant are such as to show a clear intention to exclude them from the general operation of the rule of law."

In Seneca Nation of Indians v. Knight, 23 N. Y. 498, the court held:

"A boundary line running from a post on the north bank of a creek 'thence down the same and along the several meanders thereof to the place of beginning,' which was also the bank, includes the bed of the stream to the center."

In Van Winkle v. Van Winkle, 184 N. Y. 204, 77 N. E. 36, the rule is laid down as follows:

"Where a line runs to a stake or to a mark upon a fence or a tree upon the bank of a stream or upon the side of a highway, and thence along the meandering of the stream or along the highway, the stake, mark, or tree will be deemed to indicate the place of the line and not the end thereof, by reason of the difficulty of maintaining a visible object, marking the corner in the middle of a stream or in the roadbed of a highway, thus vesting the title in the grantee."

These authorities are sufficient to indicate that a description like that contained in the grant from the state to Stene, beginning at a stake standing on the east shore of the said Oswego river and "running thence forty-two chains, then north forty-five chains, then west forty-eight chains to the said river and then up along the same to the place of beginning," would carry the title to the center of the river; but there are many other authorities that might be cited to substantiate this view.

In Commissioners of Canal Fund v. Kempshall, 26 Wend. 404 (1841), the Genesee river was involved. The state was constructing a new aqueduct across the river in the course of the improvement of the Erie Canal, and Kempshall claimed that his gristmill situated on the river below the site of the aqueduct was interfered with by impairing the supply of water. At this point the Genesee river was non-navigable, in fact, except that logs were occasionally floated to a saw-mill past the premises. A dam was situated some distance above Kempshall's property, and the river was navigable in fact for many miles to the south. Some distance below Kempshall's property was situated the Genesee Falls, from the lower one of which the river was navigable to Lake Ontario. The headnote substantially summarizes the decision:

"Fresh-water rivers, to the middle of the stream, belong to the owners of the adjacent banks. If navigable, the right of the owners is subject to the servitude of the public interest for passage or navigation. The owners, however, are entitled to the usufruct of the waters flowing in the rivers, as appurtenant to the fee of the adjoining banks, and for an interruption in the enjoyment of their privileges in that respect, in consequence of public improvements made by the state, are entitled to compensation for damages sustained."

The Chenango river was involved in the case of the Chenango Bridge Co. v. Paige, 83 N. Y. 178, 38 Am. Rep. 407 (1880). In this case Judge Earl said:

"The Chenango river is a fresh-water stream. It is the private property of the riparian owners. The public in such streams have an easement only for navigation and for floating logs and timber. As well said in Ex parte Jennings, 6 Cow. 518, 16 Am. Dec. 447: 'The public right is one of passage, and nothing more, as in a common highway. It is called by the cases an easement, and the proprietor has a right to use the land and water of the river in any way not inconsistent with this easement. If he make any erection rendering the passage of boats, etc., inconvenient or unsafe, he is guilty of a nuisance; and this is the only restriction which the law imposes upon him.' And when the case between these two bridge companies was first before this court (26 How. Prac. 124, 185), Judge Smith, in an opinion written by him, said: 'The Chenango river is a fresh-water stream, in which the tide does not ebb and flow, and is therefore a private river. The riparian proprietors own the bed and the banks. As early as 1798 it was declared a public highway, but subject to the public easement for the purpose of navigation. The riparian owners might make such use of it as they pleased—might bridge and dam it, except as prohibited by acts of the Legislature, and might cross it with ferries, except as so forbidden.' The Legislature, except under the power of eminent domain, upon making compensation, can interfere with such streams only for the purpose of regulating, preserving, and protecting the public easement. Further than that, it has no more power over these fresh-water streams than over other private property. It may make laws for regulating booms, dams, ferries, and bridges, only so far as is necessary

to protect and preserve the public easement, and, when it goes further, it invades private rights protected under the Constitution. Canal Com'rs v. People, 5 Wend. 423, 448; Pennsylvania v. Wheeling & Belmont Bridge Co., 18 How. 421, 432, 15 L. Ed. 435; Morgan v. King, 35 N. Y. 454, 91 Am. Dec. 58."

Much of the legal atmosphere on the subject of riparian rights was clarified by the case of Smith v. City of Rochester, 92 N. Y. 463, 44 Am. Rep. 393 (1883). The Legislature had granted the city of Rochester the right to supply water to its inhabitants from Hemlock Lake, an inland body of water, about seven miles in length and half a mile in width, deep enough to be navigated for boating purposes by those living upon its shores. Smith was an owner of a mill at the outlet of the lake who claimed that the city of Rochester, by abstracting water from Hemlock Lake, was interfering with his riparian rights. It was contended on behalf of the city that the state had authority to grant to the city the right to withdraw water from the lake without making compensation to any riparian owners. The court found that the contention of the city was not well taken, and that the owners of land adjoining nontidal streams, with certain exceptions, take title to the thread of the stream and, as incident to the title, acquire the right to the usufructuary enjoyment of the undiminished and undisturbed flow of the stream. In the course of his learned opinion Chief Judge Ruger said:

"We have arrived at the conclusion that all rights of property to the soil under the waters of Hemlock Lake were acquired by and belong to its riparian owners, while such rights only over its waters belong to the state as pertain to sovereignty alone." Page 476 of 92 N. Y. (44 Am. Rep. 393).

The case of Gouverneur v. National Ice Co., 134 N. Y. 355, 31 N. E. 865, 18 L. R. A. 695, 30 Am. St. Rep. 669, involved Croton Lake. The conveyances describe the property concerned as 'running to the pond near a large rock, thence northerly along said pond and "to a birch sapling" marked on the west side of the pond, "then south * * * along the pond" and "beginning near the north side of a large rock on the west side" of the pond, then "along said pond" and "beginning at a maple marked by said pond, thence north * * * along said pond." The court held that these grants ran to the center of the pond, and that together the grantees took title to the whole of it. In the course of his opinion, Bradley, J., says:

"The views already given lead to the conclusion that the common law relating to the construction and extent of grants of land bordering and bounded on such waters is applicable alike to a conveyance bounding lands on fresh-water rivers and small nonnavigable lakes or ponds. Such is the character of the one in question, and whether its bed was embraced in or excluded from the grants made by the deeds before mentioned is dependent upon their construction. The boundaries are described as along the pond; and unless in some manner qualified or restricted they, by legal construction, had the effect to embrace the bed within their grants. This in such a case is the presumed intent unless the contrary appears." Page 364 of 134 N. Y., page 869 of 31 N. E. (18 L. R. A. 695, 30 Am. St. Rep. 669).

Waller v. State, 144 N. Y. 579, 39 N. E. 680 (1895), involved the question of the right of the state to withdraw water from Skaneateles Lake to the damage of riparian owners upon the outlet of the lake,

and in that case an award of damages for the claimant against the state for withholding water from Skaneateles creek was sustained by the court of last resort. Another case which involved Skaneateles Lake was that of Lakeside Paper Company v. State, 15 App. Div. 169, 44 N. Y. Supp. 281 (1897). In this case the board of claims refused to allow damages to the claimant for the state's withholding the water of Skaneateles Lake, thereby impairing his riparian rights. The award was reversed by the Appellate Division, the court holding that the right of the state to the water of Skaneateles Lake for canal purposes was that of an upper riparian owner, and that it was liable to lower riparian owners who had mills situated on the Skaneateles outlet for the detention by it of the water of the lake.

We have, however, in this instance, two cases which involve grants of land upon the Oswego river itself and which, without other authorities, would, until overruled, seem to be sufficient to establish riparian rights in the claimants derived from their predecessor, Stene. One of these cases is Varick v. Smith, 5 Paige, 136 (1835), 28 Am. Dec. 417, and Id., 9 Paige, 547 (1842). In this case the complainant, Varick, was the owner of land and a mill on the west side of the Oswego river below one of the dams which had been constructed by the state in connection with the Oswego Canal. The defendant, Smith, was the owner of land and a mill on the opposite side of the river. The state had leased to Smith all the water of the State Dam not needed for the canal. Varick brought suit against Smith and the state to have the lease to Smith adjudged null and void and to restrain Smith from intercepting the water in its descent from the dam, alleging that Smith was preventing water from flowing over the dam to the Varick mill on the west side of the river. The patent to Varick from the state was a conveyance by lot number. The court held that the title extended to the center of the river, and that the complainant was entitled to the surplus water to the middle of the stream which flowed over the State Dam, so far as such water could be used without interfering with the public right of navigation, and that the state could not lease such surplus water and authorize the lessee to prevent it from flowing over the dam to the injury of the water privileges below. Here is a finding which has not been disturbed or criticised that a description by lot number, more general than the description in the Stene patent, conveyed to the center of the Oswego river, and that, by the construction of the dam in the Oswego river to supply its canal with water, the state had not acquired all the water of the Oswego river and could not dispose of such water as was not required for the operation of its canal, and that this surplus water was a part of the riparian rights of owners below the dam. In the Varick Case it should be noticed, also, that not only were the riparian owners parties, but that the state through its Attorney General was a party, and the precise questions here in litigation with respect to the Stene patent were involved in that case with respect to other patents of the state. For over 60 years this decision has been followed by the state authorities and has been recognized as the law upon the subject until questioned in this proceeding.

The other case is that of Van Buren v. Baker, 12 N. Y. St. Rep. 209. In that case the so-called Scriba patent was involved, a patent which embraced 499,135 acres of land on the east side of the Oswego river, extending both north and south of the Stene patent, which was excepted from the conveyance made to Scriba. This conveyance runs various courses to Lake Ontario, then to the "mouth of the Oswego or Onondaga river where it empties into the said lake, then up along the said river" to a tract of 200 acres of land granted to John Taylor, and to the said "Oswego or Onondaga river, then up along the same." It will be observed that the description of the Scriba patent is substantially the same as the Stene patent, in that the words of the description do not in express terms go to the center of the river, but extend "to" the river and "along" the river. The particular property involved in litigation was an island in the river. The Scriba patent was the original source of the title of the plaintiff to certain land on the east side of the river and to an island known as Bradstreet's island which was easterly of the center of the stream. The patent was dated December 12, 1794. The defendants claimed to be the owners of the island, tracing their title back to the original patent from the state to Christopher Y. Lansing, dated July 1, 1851, which conveyed Bradstreet's island to Lansing. The defendants, under their claim of title, cut timber on the island, and the plaintiff brought suit to recover for the alleged trespass. The action was tried before Mr. Justice Merwin and depended upon the construction which the learned justice might put upon the Scriba patent. Justice Merwin found that the Oswego river, at the point in question, was a navigable stream, in fact, and that the patent extended to the center of the river. This decision was affirmed by the General Term and stands as a direct authority in this case sustaining the contention of the claimants as to the title to the bed of the stream under the Stene patent.

The various cases relating to the Hudson river, Lake Champlain, Niagara river, and Mohawk river are not in point in this case, because in those cases tide-water or boundary streams were involved, or the title to the bed of the stream was expressly reserved by the state in its grants. Smith v. City of Rochester, 92 N. Y. 463, 44 Am. Rep. 393. We are dealing in this case with a nontidal stream which is not a boundary stream, and which, at the point in question, is not even navigable in the common acceptation of the term.

The construction here placed upon the Stene patent is, as we have seen, the construction which has been placed by the courts upon patents of land along the Oswego river which have come up for review. The language of these patents is substantially the same. In no one of them is there an express reservation to the state of the bed of the stream, and in all of them, except where the conveyance is by lot number, the description runs "to the river," "to the shore of the river," and "up along the river," showing that the language in the Stene patent was the one commonly employed by the state in its grants of land upon this stream. Stene Patent, Ex. 9; Scriba Patent, Ex. 10; Taylor Patent, Ex. 12; Cluett Patent, Ex. 13; Newkirk Patent, Ex. 15; Van Wagenen Patent, Ex. 16; Newkirk Patent, Ex. 17.

There are acts of the state which bear out the construction here placed upon the Stene patent. Private enterprise had developed to some extent the water power on the Oswego river before the state constructed the Oswego Canal.

In order to supply itself with sufficient water to operate the canal, it constructed dams at different points. In the early history of the Oswego Canal, prior to the case of Varick v. Smith, the right to sell the surplus water created by the construction of these dams was raised, and statutes were passed and various acts were done by the state officers on the assumption that the state owned the surplus water thus created. Meanwhile controversies had arisen between the state and riparian owners which were set at rest by the case of Varick v. Smith; and, since the decision in that case, the state has uniformly recognized the rights of riparian owners to the surplus water not needed for the operation of the Oswego Canal. For upwards of 65 years, the state has acquiesced in the claim of the riparian owners to the use of the surplus water at the dam in question. There existed a mill, substantially at the site of the present power plant station of the claimants, as early as 1819; and since that time there have attached to this property certain riparian rights, which the state has not disputed and has not disturbed, except as necessary for the operation of the Oswego Canal. Consistent with the position of the state since the decision in the Varick Case, the state in this proceeding has served upon the claimants notices of appropriation, two of which purport to take from the claimants all of their riparian rights, indicating an intention to appropriate such riparian rights remaining in the claimants derived from the Stene patent and not theretofore disposed of or acquired. These acts of the parties throw some light upon the interpretation which should be given to the Stene patent; for the recognition by the state for upward of 65 years of the riparian rights of the claimants or their predecessors is a strong factor to be taken into account in construing the state's patent. It is obvious therefore that the language of the Stene patent, in view of the decisions of the courts and the practical construction placed upon it by the parties, should be construed to extend to the center of the river, carrying with it such riparian rights as belong to the owner of the bank of a nontidal, nonboundary stream.

The construction thus given to the Stene patent inures to the benefit of the claimants, for, by mesne conveyances and by similar language as that in the Stene patent, land belonging to their predecessors sought to be taken in this proceeding which formed a part of the Stene patent has become vested in them, and this title carries with it the usual riparian rights in nontidal, nonboundary streams which still adhere to the land. The property was conveyed in the form in which it was patented to Stene and in the identical language of the patent down to the year 1819, with two exceptions. These exceptions are the conveyance in 1794 from Elijah Bent to Benjamin G. Minturn and John T. Champlin, and in 1801 from James Caldwell to Samuel Hubbard and Isaac Crocker. In these conveyances the description is "to the bank or edge of the Oswego river, then down the river on the edge of the river to the place of beginning"; but any ambiguity of intention to

convey the bed of the river is cured by the following descriptive words, summing up the conveyance as "a tract of land granted by the state of New York to Conrad Stene." Ousby v. Jones, 73 N. Y. 621. From 1819, the year in which Norman Hubbard and George F. Fally acquired title to Stene's 200 acres, the land was divided; but the chain of title in each case runs back to this common source.

In 1836 Samuel Farwell acquired title to the power plant station property through two separate chains of title, in one of which the property is described as running "to the Oswego river" and "down the Oswego river," and, in the final deed to him of the other, as lot No. 3 in a certain map of Peter Schenck, which carried the lines out into the river. Other conveyances in the chain of title of the power plant station property contain the language "to the Oswego river, thence down said river." Later conveyances, particularly since the year 1882, run "to the center of the Oswego river" and "along the center of the Oswego river." The conveyance to the claimant herein made March 28, 1902, conveys the property "to the center of the Oswego river, thence meandering the center of the river northerly till it intersects the north line of lot number three, block number twenty-five." From these conveyances the intention of the parties to convey to the center of the river is plain.

The chain of title of the Kenyon mills property bears out the construction given above to the Stene patent and contains abundant evidences of a claim of ownership to the center of the river and of actual conveyances of the land to the center of the river. Thus, when Norman Hubbard and wife conveyed to George F. Fally, by deed dated January 4, 1828, the south half of the Stene location, they expressly reserved the water privileges in the Oswego river. The conveyance runs to a point "at the edge of the Oswego river" and to a point "at the water's edge" and contains these words:

"Reserving, however, all right, title and interest whatsoever to the water or hydraulic privileges in the Oswego river belonging or in any wise appertaining or that may heretofore have belonged or appertained to the above described premises."

When Hubbard conveyed parcels from the north half of the Stene location, conveyances ran "westerly to the Oswego river" and "on the west of the Oswego river." Many conveyances in this chain of title contain the above language. In the conveyance from Robert C. Kenyon and others to Charles G. Case and others, dated March 30, 1848, the description runs "to the middle of the Oswego river or as far as our rights extend into said river; thence northerly along the middle of said river." The Kenyon mills property is connected with the hydraulic canal, and many of the conveyances contain references to the quantity of water which the property is entitled to use. Thus the conveyance from Henry Suydam, Jr., and others, to W. S. Nelson, dated June 28, 1850, conveys to the grantee "the right and privilege of drawing a sufficient quantity of water from said canal to propel six runs of mill stone and the necessary machinery for the same in the business of manufacturing flour subject to the rights of the state of New York to control the water for canal and other purposes." These

references are sufficient to show that the conveyances in the chain of title of the Kenyon mills property recognize rights in the Oswego river and contain language which carry the title to the center of the river.

The chain of title of the Genesee mills property reveals more clearly than that of the other two parcels the dispute as to water rights between the state and the owners of land bordering upon the Oswego river subsequent to the construction of the Oswego Canal and the assertion and conveyance of water rights by abutting owners after the decision of the Varick Case in 1842. The conveyance from George F. Fally and wife to Norman Hubbard, January 4, 1828, carried the title "to the Oswego river, thence up along the river," and conveyed "all right, title and interest whatsoever to the water or hydraulic privileges in the Oswego river belonging or in any wise appertaining to the said Stene's location." This conveyance was the conveyance of the north half of the Stene location, which north half includes the premises in question. The conveyance from Sarah Hubbard to William Jerome and Henry Wells, made August 11, 1830, conveys the right to use the bed of the river, and some of the subsequent conveyances contain the same language. The conflict between the state and riparian owners is revealed in conveyances and contracts made after the construction of the Oswego Canal. Thus, in the conveyance between Samuel Farwell and Charles G. Case and others, made February 4, 1837, the parties convey certain water privileges, with this reservation, however, that if, at any time thereafter, the "state of New York shall lawfully deprive the parties to this agreement of the rights or privileges of drawing water from the pool and dam aforesaid for the supply of the mills and machinery hereafter to be erected upon said canal by the parties of the second part," a certain sum of money was to be paid. After the decision in the Varick Case, we find some of the conveyances containing express language carrying the title to the center of the river. Thus the deed from George Salmon and others to Charles G. Case, dated March 16, 1854, extends "to the middle of the Oswego river, or as far as the right of said parties hereto extend into said river; thence northerly along the middle of said river." A number of other conveyances in this chain of title contain the same language carrying the lines to the center of the river. Other conveyances extend a certain number of feet into the river. The conveyance from Dorman Felt and wife to Oren Belding, dated June 13, 1846, extends "100 feet into the river, thence northwardly down the river." Finally, deeds to the claimant contain a conveyance "of the right to draw certain quantities of water from the pool or trunk or flume connected therewith with the right to discharge the same into the Oswego river."

These references are sufficient to show: That, from the earliest conveyances containing any mention of the Oswego river, the parties have claimed title to the bed of the river and to riparian rights in the river; that their rights in this respect were in question for a time, but that this doubt was resolved by decisions of the courts in favor of the claim of the owners of the land abutting upon the river; and that since that time it has been asserted subject to such rights as the state

acquired through the construction or reconstruction of the Oswego Canal.

This paper title is supported by such an occupancy of the land and use of the water under a claim of title as, alone, would establish a title by adverse possession as against the state. The claimants' claim of title goes back over a hundred years to a patent granted to Stene in 1793, and since that year, and particularly since the decision in the Varick Case, which occurred in the year 1842, over 65 years ago, Stene and his successors in title have claimed the land in question and the riparian rights attached thereto. The deeds describe the land substantially as in the Stene patent as extending "to" the river and "along" the river; but as early as 1837, 70 years ago, there was an agreement between parties having interests in the property in question describing the property as running to the center of the river. Abstract, p. 244. In 1831 a map made by Schenck laid down the lines as running to the center of the river. Exhibit 21. Deeds in 1846 likewise described property forming a part of the patent as extending to the center of the river (Abstract, pp. 241, 245), other deeds contain similar language (Abstract, pp. 144, 321), and since 1876 all of the conveyances carry the title to the center of the river. As early as 1813 there was a mill upon the site of the present power plant station, and from that time there has continued to be upon the property some sort of a structure using the water from the Oswego river for power purposes. When the state constructed its canal in 1826, it drew a blue line indicating the extent of its appropriation covering some land which was formerly embraced within the Stene patent, but not the land in question; and a few years thereafter, disputes having arisen, it was decided by the courts that the state had not acquired all of the water of the Oswego river and was obliged to allow the surplus water to flow down the channel of the stream. Since that time the state has acquiesced in the rights of the claimants and other riparian owners, and not until the present proceedings has the title of claimants or their predecessors in the land occupied by them been disputed by the state. The land in question, which the claimants or their predecessors in title have occupied for at least 90 years, forms no part of the canal lands of the state, since it is not inclosed within blue lines; and the construction and maintenance of the dam vested in the state only such land as was occupied by the dam and necessary for its maintenance. It cannot be said therefore, inasmuch as the tolls on the canal were not abolished until 1895, that the state has received rents or profits from the land in question as canal lands. The premises have not been vacant, but have been occupied for nearly a century; and there is therefore no presumption of the receipt of any rents or profits therefrom by the state as vacant land.

In 1840, by chapter 292, p. 237, of the statutes of the state, the canal board was authorized to grant permission upon suitable terms to private persons to erect on any state dam or pier any warehouse, mill, or other building to be used for commercial or manufacturing purposes, or for any purpose incidental or auxiliary thereto, and to use such amount of water power created by the dam or pier as might

be used without injury to the interests of the state; but it was pro-
vided that such permission should not be granted in any case, other
than the pier in the Niagara river at Black Rock, "to any person who
is not the owner of the land over which the water to be used flows, or
the owner of the land adjoining the river or other stream of water at
the place where any such dam and mole or other work is or shall
be erected." The claimants and their predecessors have constructed
and maintained the south wall of their building upon the State Dam
and pier at Fulton and have been using an opening in the dam for the
supply of water to the power plant property. This fact, however, will
not militate against the claim of adverse possession on the part of the
claimants, since it only relates to the dam or pier and does not extend
to any other property occupied by the claimants or by their predeces-
sors. This alleged right to occupy the State Dam or pier goes back
more than 40 years, as does also the actual construction and mainte-
nance of the south wall of the building of the power plant and the use
of the opening in the dam. No claim of receipt of rents or profits
from the land in question can be based upon the occupancy and use of
a part of the dam and pier under the statute of 1840, since it does not
relate to the premises actually in dispute from no part of which has the
state derived any rents or profits. Not only did the state not receive
any rents or profits from this land, either as canal land or by any con-
struction that might be placed upon the statute of 1840, but it has ac-
tually received taxes assessed against the property, showing that the
state recognized the private ownership of the premises, which recogni-
tion has continued down to the present appropriation, all of the notices
for which embrace the land over which the dispute arises in this pro-
ceeding and two of the notices for which embrace all of the riparian
rights attached thereto.

Further recognition by the state of private ownership is shown by
awards made by the predecessors of this court, the board of claims,
and the canal appraisers. Awards for land under water and for ri-
parian rights attached to land embraced in the Stene patent have been
made by them (Exs. 59, 60, 61, 62, 64, 65, 66, 67, J. T.), and the Legis-
lature itself passed special statutes to afford relief to particular cases
where water rights attached to land in the Stene patent were affected.
Laws 1854, p. 497, c. 220; Laws 1868, p. 756, c. 340. Reference to
these awards show that, while the state prior to the decision of the
Varick Case in 1842 assumed to own the surplus water of the Oswego
river where it had constructed dams, executing leases and receiving
payment therefor, after the decision in that case it acquiesced in its
binding force, recognized the rights of riparian owners, and in some
cases reimbursed the lessees. In the award of the canal appraisers to
Lauren Seymour and others, made in 1857 (Ex. 55) for the destruc-
tion of a dam by the state in 1829, the appraisers say:

"The parties owning the land and the easement in the water adjoining
had as riparian owners the right, at least as against the state, to erect their
dam; and the only explanation why an act was deemed requisite may be
found in the general opinion of that day that the state had the exclusive right
in the control over all fresh as well as salt water streams. This opinion has
been rectified by recent decisions of the judicial tribunals of our state. Al-

though the Oneida river may have been declared a public highway, we suppose that this could not have prevented the erection of structures for hydraulic purposes by those owning the lands to which the water was an easement, provided they did not obstruct the navigation."

The award to Edmund Merry and George G. Breed by the canal appraisers in 1872 (Ex. 58) expresses the same views:

"The references of the learned counsel for the state to numerous statutes in regard to surplus waters, etc., are not applicable, as those statutes were all passed long before the decision of Varick v. Smith, 9 Paige, 547, which was in 1842, and the proceeding of the canal board put in evidence in this case was recognized by the board in acting upon the petition of Phœnix for the repayment of the money he had paid the state for the rent of the surplus waters sold to him by the state in 1827 or 1828. The money was repaid with interest to Phœnix; he insisting, and the canal board assenting, that by the decision in Varick v. Smith, the state had undertaken to sell to him what always belonged to him, and which therefore the state did not own, and therefore had no right to sell."

The effect of these facts to establish adverse possession is not destroyed, although the land occupied by claimants, or part of it, was formerly land under water, for such land, under the authorities of this state, may be acquired by prescription. An authority for this position is found in the proceeding of the state to acquire land for the Niagara reservation. Matter of Commissioners of State Reservation at Niagara, 37 Hun, 537. In that case the commissioners held that the Niagara river was a boundary stream, and that the title of the land upon its shore extended only to high-water mark, and that the state owned the bed of the river. They found that one of the claimants in that case had acquired by prescription riparian rights in the river, for which they awarded him substantial damages. Another authority is that of Timpson v. Mayer, 5 App. Div. 429, 39 N. Y. Supp. 252, in which the court says:

"That title to land under water in a navigable river, as well as exclusive rights of fisheries therein, may be acquired by adverse possession or prescription against the state, is settled law in this jurisdiction."

Under these facts claimants have acquired title to the land in question by adverse possession and also to such riparian rights used by them as have not been appropriated to the canal for canal purposes prior to the present appropriation. The general rule is that title by adverse possession cannot be acquired as against the state in the absence of statutory authority. This authority, however, is found in various statutes which prescribe the limitations within which the state and those making claim under it may maintain an action to recover real property. The limitation contained in the statute of 1788 was 40 years. Page 683, c. 43. The same limitation was prescribed in the statute of 1801. Page 509, c. 183. From 1830 to 1848 the limitation was 20 years, while, since the enactment of the Code of Procedure, the limitation has been 40 years. These statutes have provided that the state will not sue for or with respect to real property or the issues or the profits thereof unless the cause of action accrued within the period prescribed before the commencement of action, or unless the people or those from whom they claim have received rents or profits from the real property or some part thereof within the same period

of time. The state therefore might maintain an action to recover the property in question, provided it could show that its cause of action accrued within the statutory period, or provided it could show that it had received rents or profits from the property within the same period of time. The state is not in a position to show either of these facts, and in this proceeding has not established either of these facts. Such being the provisions relating to a claim by the state, one claiming as against the state would be required to show, not only that no cause of action has accrued to the state within the statutory period, but that the state has not received any rents or profits from the property or any part thereof. These conditions are complied with by the proofs in this case, and the claimants therefore have shown title by adverse possession as against the state irrespective of their record title. People v. Livingston, 8 Barb. 253; People v. Clarke, 10 Barb. 120; People v. Arnold, 4 N. Y. 508; People v. Van Rensselaer, 9 N. Y. 291; People v. Rector, etc., of Trinity Church, 22 N. Y. 44.

The record title and the doctrine of prescription dispose of the position of the state that the land sought to be condemned is in the original bed of the Oswego river. This position was sought to be maintained by evidence of living witnesses and by excavations made tending to show that the land had been filled in. The state claims that the high bank to the east of the premises formed the original bank of the river. This contention may be true, but the fact is so far in the past that it will not form a basis for adjudicating this case. It is quite likely that the Oswego river was originally much higher than at present, and that it covered a great deal of land which is now out of water; but, even if this fact were established, it would not disturb the title of the claimants. Whether or not the title of the claimants extends to the center of the river, this being a nontidal, nonboundary stream, any land which they may have reclaimed from the bed of the river may be occupied by them, so long as they do not interfere with the paramount right of the state or federal government to improve the bed of the river for purposes of navigation or commerce. As bearing upon the subject, it is a significant fact that, as far back as 1813, and ever since that time, there has been a mill site at the location of the present power plant station.

This disposes of the question of title which the court is called upon to decide at this stage of the case, and the answer to this question is clearly that the claimants are the owners in fee of the land sought to be condemned and of the riparian rights attached thereto. If the conclusions above arrived at are correct, the Stene patent covered all of the land under the Oswego river to the center of the river and all of the riparian rights attached thereto, and all of these riparian rights continued in Stene and his successors in title down to the construction of the canal in 1826 when, by the building of the dam across the Oswego river and the construction of the canal, the state acquired riparian rights attached to the premises covered by the Stene patent, and later, in 1857, when the Oswego Canal was improved, additional riparian rights were acquired. The extent of these riparian rights this decision does not determine, for the question involves facts concerning which no proofs have been offered. What riparian rights

remain in the claimants after such acquisition by the state likewise remain unadjudicated for the same reason. What part of these riparian rights the state seeks to acquire in this proceeding is also one of the questions left in abeyance. This decision merely holds that the claimants are the owners of the land actually proposed to be taken and of such riparian rights as still attach to their premises, leaving all other questions for future determination.

Judgment accordingly.