(5 App. Div. 424.)

TIMPSON et al. v. MAYOR, ETC., OF CITY OF NEW YORK et al.

(Supreme Court, Appellate Division, First Department.   May 22, 1896.)

1. BULKHEADS—RIGHT TO CONSTRUCT.
    Laws 1798, c. 80, § 7, which provides that no building of any kind other than piers and bridges connecting therewith shall be constructed by any person in front of the street or wharves opposite their property in New York City, does not forbid the construction of bulkheads.

2. SAME—ACQUISITION BY ADVERSE POSSESSION.
    Title to land under water in the Hudson river, with the right to construct bulkheads thereon, may be acquired by adverse possession against the city of New York; Code Civ. Proc. § 365, providing that an action to recover real property, or the possession thereof, cannot be maintained by a party other than the people, unless there has been seisin within 20 years.

Appeal from circuit court, New York county.

Action by Theodore Timpson and Frank Phelps, as executors and trustees, and Mary B. Chamberlain, as executrix and trustee, under the will of William L. Chamberlain, deceased, and George A. Phelps, Charles H. Phelps, Howard Phelps, Harriet A. Brooke, and Julia M. Winter against the mayor, aldermen, and commonalty of the city of New York and the Old Dominion Steamship Company.   From a judgment dismissing the complaint, and from an order denying a motion for a new trial, plaintiffs appeal.   Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, WILLIAMS, and PATTERSON, JJ.

Cecil Campbell Higgins, for appellants.
Theodore Connoly, for respondents.

WILLIAMS, J.   This action is brought to recover the value of a certain bulkhead property, 100 feet in length, situated on the westerly side of West street, in the city of New York, and bounded on the south by the extension of the northerly line of Beach street. The property was appropriated by the dock department on May 1, 1880, without compensation, on the theory that the plaintiffs had no title thereto.   In 1809 the city of New York granted to John H.

Murray and William Ogden a water lot bounded on the west by the easterly line of West street, and having a frontage of 100 feet on that street. This lot faces the locus in quo, being separated from it by the width of West street. The grantees covenanted to build, when required and directed, the whole of Washington street, through the premises granted, one-half of Beach street on the south, and one-half of West street on the west; also, upon the like direction, to aid the city in completing the other half of West street. The grant reserved to the city a right to re-enter for breach of any of the covenants and conditions, and contained a covenant for quiet . enjoyment if they should be kept. In 1816, Murray and Ogden mortgaged, with other premises, the westerly half of the block bounded by Hubert, Washington, Beach, and West streets to the Mechanics' Bank. The mortgage was foreclosed, and the bank bought in the property on March 21, 1818. In the preceding January, Murray and Ogden had made a full covenant and warranty deed to Mary Murray and Hannah L. Murray of that part of the bed of West street west of the premises above mentioned, "with all the water right in front of said ground extending as far into the North river as the corporation will grant." This deed was not recorded until 1839. In the meantime Hannah L. Murray died, leaving a will, giving her executors full power to sell her real property. In 1839 two deeds were executed to the bank. One was made by Hannah L. Murray's executors; the other by John R. Murray and wife, Mary Murray, and Susan Ogden, widow of William Ogden. Each of them conveyed:

"All that certain bulkhead, wharf, or dock situate, lying, and being in the Fifth ward of the city of New York, on the westerly side of West street, between Beach and Hubert streets, bounded northerly by property formerly of Joseph Newton, deceased, and now of the said parties of the second part, and southerly by Beach street, and extending along West street aforesaid 100 feet."

This is the first reference to the bulkhead. From the bank it passed, by various mesne conveyances, to William Chamberlain and George A. Phelps, through whom the present plaintiffs derive their rights. The plaintiffs admit that the conveyance of 1809 did not give their predecessors title to the land on which the bulkhead was built, or any right to take the wharfage and cranage accruing from West street. itself. They base their title to the bulkhead, and to the rights of wharfage and cranage accruing therefrom, upon adverse possession and prescription. There was abundant evidence upon these heads for the consideration of the jury. The testimony of a living witness shows the bulkhead as in existence in 1821. From 1839 down to the time it was taken by the city, it was in the continuous possession of the plaintiffs or their predecessors, who, during the greater part of the period, leased it, and collected the rent. It is not necessary to review the evidence in detail, as the whole question was taken away from the jury. The only point for consideration is whether the trial judge was right in his decision that there were obstacles preventing the acquisition of the property by adverse user.

The first claim made by the defendants is that the bulkhead was an illegal structure, prohibited by statute, which the city could not have granted the right to construct; and that, consequently, no title thereto could be acquired by adverse possession. Chapter 80 of the Laws of 1798 provides for the paving out of streets along the water front of the city. A number of duties are laid down upon the inland proprietors, and among them (section 5) that of building piers, connected with suitable bridges, in front of the streets or wharves, and opposite their property. Section 7 then provides:

"And be it further enacted, that no building of any kind or description whatsoever (other than the said piers and bridges) shall at any time hereafter be erected, upon the said streets or wharfs, or between them respectively, and the rivers to which they respectively shall front and adjoin."

These provisions are amplified in Rev. Laws 1813, c. 86, section 227 of which re-enacts, in the same words, the prohibition contained in section 7 of the act of 1798.

It can hardly be that this prohibition included the plaintiffs' bulkhead within its scope. It was intended that West street should be the water-front street. To this end it was necessary to preserve the means of access from the river to the street, and all "buildings," other than those specified, were forbidden. The word is not an apt one to describe a bulkhead, which is, besides, a necessary feature of water-front property. This view is strengthened by the act of 1855 (chapter 121), which created the "Harbor Commission." The preamble of that act recited that:

"It is represented to the legislature that the harbor of New York has become much obstructed by the erection of piers, wharves, and bulkheads, and by other causes, and that grants of rights to occupy land under its waters have been made, and are liable to be made, without sufficient information of the extent of the injury that may be inflicted by such occupation, by narrowing the channel, and otherwise."

And the commission was appointed with the view "of obtaining the proper information to enable the legislature to control such erections, and prevent such injury." It was to determine, among other things (section 1, subd. 1), "whether in reference to the present and probable future commerce of the cities of New York and Brooklyn, any further extension of piers, wharves, or bulkheads, into the said harbor, ought to be allowed, and to what extent." There is here the plainest recognition that the city had power to make, and had made, lawful grants of land under water west of West street, and elsewhere, and that bulkheads might legally be erected thereon. It was the contemplated spread of the practice, threatening to unduly narrow the channel, which led the legislature to intervene, and to enact section 2 of this act, which reads:

"No grants of land under the waters in respect to which the said commissioners are herein required to report shall be made by the commissioners of the land office or of the common council of the city of New York, or by any board of officers or corporation, until the further direction of the legislature in the premises."

There is every indication that this was the first restriction upon the power of the city to grant its lands under water, and permit the

erection of bulkheads thereon.   If previous grants had been void, and bulkheads previously erected illegal structures, there would have been no necessity for the act.   There is another circumstance strengthening this conclusion.   In the act of 1798 no limit was set beyond which the piers might not extend, while in 1855 the legislature aimed to, and afterwards did, establish both pier and bulkhead lines.   The different state of things along the water front in 1798 and 1813 evidently led to a different mental attitude on the part of the legislature.   It was then the interest of the city to gain ground out of the river, and there was no serious danger that the channel would be encroached upon to too great an extent.   Thus, the legislature, while preserving access to the river, did not restrict the building of piers and bulkheads.   But if this view were erroneous, and it was the intention from the beginning that West street should serve as the bulkhead line of the city, subsequent legislation relieved the plaintiffs from this disability.   The harbor commission reported to the legislature the lines which it had determined upon as the desirable pier and bulkhead lines of the city; and the legislature adopted the same, and prohibited grants beyond these limits.   Laws 1857, c. 763.   The record shows that the locus in quo was within the limit thus fixed.   Thereupon the temporary prohibition contained in the act of 1855 was repealed.   Laws 1858, c. 360. Plain authority is given by these acts to build bulkheads up to the line so fixed; and 23 years elapsed between the passage of the act of 1857 and the time when the property was taken by the city.   We know of no other legislation pertinent to this question, and none has been referred to us.   Our conclusion on this branch of the case is that no statute exists, or has existed, which is a bar to the maintenance of this action by the plaintiffs.

It is also said that the land on which the bulkhead was built was either within the limits of West street, or was land under water in the Hudson river, and that in neither case could title thereto be acquired by adverse possession.   The first question does not arise, for it is conceded that the bulkhead was west of West street; and, if otherwise, the really valuable rights taken from the plaintiffs were the rights of wharfage and cranage, and these the city could grant to individuals to be enjoyed on the line of the street itself. Langdon v. Mayor, etc., 93 N. Y. 129;   Williams v. Mayor, etc., 105 N. Y. 419, 11 N. E. 829.

The sole remaining question is whether the title to land under water in the Hudson river, with the rights of wharfage and cranage appurtenant thereto, may, in the absence of statutory restrictions, be acquired by adverse possession and prescription against the city of New York.   That the city, not the state, is involved, seems undeniable, in view of the admissions in the record that the land under water on which the bulkhead was built was either in the tideway, and so came to the city in 1686, under the third section of the Dongan charter, or that it was in the 400-foot strip which was granted to the city by the thirty-eighth section of the Montgomerie charter, in 1730.   We do not sanction the view of the trial judge that this would work a difference in the right to acquire title by adverse user.

It certainly would, however, as to the length of time necessary to acquire rights. The defendants' counsel do not distinctly dispute that title by adverse possession may, as a general proposition, be acquired against the city of New York. That it may is hardly open to doubt. Section 365 of the Code provides that "an action to recover real property, or the possession thereof, cannot be maintained by a party other than the people," unless there has been seisin within 20 years. The city is certainly a "party other than the people." There being no doubt as to the general doctrine, no satisfactory reason has been assigned why land under water in the Hudson river should form an exception to the general rule. That title to land under water in a navigable river, as well as exclusive rights of fishery therein, may be acquired by adverse possession or prescription against the state, is settled law in this jurisdiction. Rogers v. Jones, 1 Wend. 237; Trustees v. Strong, 60 N. Y. 56. What may not be acquired is the right to interfere with the public easement of navigation.

It was said by Selden, J., in People v. Vanderbilt, 26 N. Y. 287, at pages 292, 293:

"The right of property in the soil or bed of a navigable river or arm of the sea, and the right to use the waters for the purposes of navigation, are entirely separate and distinct. The first of these rights is by the common law vested prima facie in the sovereign power,—that is, in England in the king, here in the people,—but may be alienated by the king or people so as to become vested in an individual or corporation. The second is a right common to the whole people, and it is vested in the public at large. A purpresture is an invasion of the right of property in the soil, while the same remains in the king or people. A nuisance is an injury to the jus publicum or common right of the public to navigate the waters. It will be seen, therefore, that there is a wide difference between the two, and that, although they may co-exist, yet either may exist alone without the other."

And a little later the learned judge quotes from Lord Hale the statement that, when an action is brought to remove an obstruction which is not a purpresture, but which is claimed to be a nuisance, "a nuisance in fact must in all cases be shown to exist."

It is apparent that all these different doctrines harmonize perfectly. A purpresture may ripen into a title because the sovereign power might make a grant of the property in question; but a nuisance never can, because "the king cannot license a common nuisance." Hale, de Portibus Maris; Harg. Law Tracts, 85. The rights of passage and repassage in a public street, and of navigation in public waters, reside in the sovereign people alone. It is impossible to obtain a valid grant of them from any source; and, consequently, no individual can acquire a prescriptive right to their exclusive use.

An instructive case, and one directly in point, is Nichols v. City of Boston, 98 Mass. 39. It was there held that the plaintiff had obtained, by adverse occupation, title to a wharf and wharfage rights against the defendant; and Judge Gray points out in the opinion the distinction to which we have alluded. It does not seem to be seriously claimed that the plaintiffs' bulkhead was a nuisance or interfering with the public right of navigation. There does not seem

to be in this state any such precise authority as Nichols v. City of Boston. The undoubted fact, however, that title to the land and wharfage rights might have been acquired by adverse user against the state, is sufficient. The city's rights could not well have been greater than the state's, and it is, indeed, assumed by the defendants' counsel, that they were less. There are, however, two cases so similar in their facts as to be worth citing for the implications contained in them. They are Towle v. Remsen, 70 N. Y. 303, and Roe v. Strong, 107 N. Y. 350, 14 N. E. 294. In the former the city made a grant of certain water lots to the defendant's predecessors, with a condition of re-entry if it should appear thereafter that the grantees did not own the adjoining uplands. They did not, in fact, own the uplands; and plaintiff, who did, got the commissioners of the sinking fund to cancel the former grant, and convey to him. This was more than 20 years after the defendant's predecessors had obtained their deed, and entered into possession. It was held, among other things, that the action was barred by the statute. It was said that a difference existed between the running of the statute against the city and against the plaintiff, its grantee; that as to the latter the possession was adverse from the outset, while as to the former it might not be. But Miller, J., observed:

"It would, at least, be questionable whether the statute would not commence to run from the time that the city had information that the grantee had no title to the upland." Page 315.

In Roe v. Strong the question was whether the plaintiffs had acquired, against the town of Setauket, title to land in Setauket harbor, a navigable arm of the sea. Andrews, J., reviewed the evidence upon which the claim rested, and held it totally insufficient. Page 359, 107 N. Y., and page 294, 14 N. E. There was a plain indication that title might have been so acquired if the user of the plaintiffs had been sufficiently adverse and exclusive.

Mayor, etc., v. Law (Sup.) 6 N. Y. Supp. 628, affirmed in 125 N. Y. 380, 26 N. E. 471, is cited against the plaintiffs, but is not in point. There the defendants claimed to have acquired wharfage rights on an inland street, although they and their predecessors had recognized the land as land in a public street, and their use thereof was totally inconsistent with any such admission.

Our conclusion is that there was nothing to prevent the plaintiffs from acquiring title by adverse user to the bulkhead and wharfage rights for which they sue. We know of no principle, and none has been suggested to us, which prevents the acquisition of title in this manner, unless the circumstances negative the presumption of a grant. We do not discover such circumstances in the case at bar. The decision of the trial court that the city had no power to grant such property is somewhat surprising in view of the past history of the city and the legislation relating to the water front. Its logical effect would be to nullify a vast number of grants of similar property. That such grants were, however, valid, has been expressly determined. Langdon v. Mayor, etc., and Williams v. Mayor, etc., supra. The more serious question considered and decided in the Langdon

and Williams Cases was whether such grantees, conceding their grants to be valid, obtained thereby the right to full compensation for the destruction of their wharfage rights by the establishment of an exterior bulkhead line on land belonging to the city or state. This question was determined in favor of the wharf owner, and, if the plaintiffs make good their position on a new trial, they will stand on the same footing as all other owners of wharf property, and be entitled to the same compensation.

The judgment should be reversed, and a new trial granted, with costs to the appellants to abide the event. All concur.