(140 App. Div. 289.)

## KNAPP et al. v. CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department. October 28, 1910.)

1. ADVERSE POSSESSION (§ 13\*)—EVIDENCE TO SUSTAIN.

Where a grantee of certain property entered upon the same under a deed in 1851, and erected a substantial building on the premises, and he and his successors were in open and undisputed possession, exercising acts of ownership and paying taxes, without question from any source until the year 1906, title had been acquired by adverse possession.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 65–76; Dec. Dig. § 13.\*]

2. ADVERSE POSSESSION (§ 109\*)—RECOGNITION OF TITLE.

Where plaintiffs and their predecessors had been in adverse possession for over 50 years, and in 1907 plaintiffs asked for a quitclaim deed from the city to satisfy a doubt as to the title raised by a title company, the application asserting title, and denying any right, title, or interest in the city, such act did not in any way destroy the title, which had become perfected.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 629–635; Dec. Dig. § 109.\*]

Appeal from Special Term, New York County.

Action to quiet title by Charles B. Knapp and Mary E. Sammis, as executrix under the last will and testament of Alice M. Knapp, deceased, against the City of New York. From a judgment dismissing the complaint on the merits, plaintiffs appeal. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, McLAUGHLIN, and DOWLING, JJ.

Bayard L. Peck (William A. Ferguson, on the brief), for appellants.

Archibald R. Watson, Corp. Counsel (Francis J. Byrne, of counsel, and Theodore Connoly, on the brief), for respondent.

CLARKE, J. The premises in controversy consist of a strip about 40 feet in width by about 100 feet in depth, bounded on the north by the south line of 158th street, and on the west by the land of the New York Central & Hudson River Railroad. With other property they were conveyed by James Beckman and wife to Samuel Watkins, by deed dated October 17, 1816, by a description which ran "to the Hudson river, and thence northerly along the said river." Watkins and wife conveyed the premises and other property to Victor G. Audubon, by a deed dated August 16, 1843, by a description which ran "to the line of high water, \* \* \* thence still along the line of high water." Victor G. Audubon and wife conveyed said premises and other property to Lucy Audubon, by deed dated September 27, 1850, by a description which ran "to the line of high water, \* \* \* thence still along the line of high water." Lucy Audubon conveyed to Dennis Harris, by deed dated November 5, 1851, "to high-water mark on the Hudson river and along the line of high-water mark, \* \* \*. excepting and reserving out of and from the above-described premises.

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

that part thereof heretofore conveyed to the Hudson River Railroad Company for railroad and other purposes, being a strip of land 66 feet wide and the same now in possession of said railroad company, for the location, extent, and particulars of which grant reference is hereby made to the deed or conveyance of said strip of land and to the record thereof when and by the same will more fully appear."

In its decision the court found that Dennis Harris entered upon said premises under the deed from Lucy Audubon, dated November 5, 1851, and in 1853 erected a substantial building on the premises in suit, and used and occupied the same. Harris gave a mortgage to David Banks, president of the East River Bank, dated January 29, 1855, to secure the payment of $5,000, wherein the description is as follows:

"Beginning at the point where the Hudson River Railroad intersects the southwesterly corner of 158th street; thence southerly along the line of the Hudson River Railroad 100 feet; thence easterly and parallel with 158th street 50 feet; thence northerly and parallel with the Twelfth avenue 100 feet; thence westerly along the line of 158th street to the place of beginning."

A judgment of foreclosure and sale, filed January 15, 1858, of this mortgage, was had, and in the said judgment it was adjudged that the word "southwesterly" in said description was inserted through inadvertence, and that the intention of the parties was to use the word "southeasterly," and that the land intended to be covered by the mortgage should be described by substituting the word "southeasterly" for "southwesterly." Under the foreclosure sale the referee deeded the property to the East River Bank on March 28, 1858, repeating the description of the judgment, and the bank conveyed by the same description to Catherine F. Knapp on August 15, 1858. Mrs. Knapp having died, the present plaintiffs hold title by descent and devise.

In 1906, plaintiffs having contracted to sell this strip of land under consideration in conjunction with the land adjoining it on the east, a title company which examined the title for the proposed purchasers raised the objection that the premises described in the complaint were west of the original line of high water of the Hudson river, and that title thereto had under the Dongan charter vested in the city of New York. The plaintiffs thereupon, in February, 1907, for the purpose of quieting title and avoiding litigation, petitioned the commissioners of the sinking fund for a quitclaim deed of the strip from the city. The said petition set forth that the petitioners were the owners of the described premises; that they had contracted to sell the premises, and that the vendee had rejected title on the ground that a portion thereof lies west of and below the original high-water line of the Hudson river, and that the fee thereof is vested in the city of New York; that they were informed and believe that the claim of said vendee is wholly based and founded upon the fact that the map made by Randall, dated April 10, 1819, shows the high-water mark at that time as set forth on a certain survey made by George C. Hollerith, dated May 16, 1906; that they were informed and believe that said map is erroneous, and that said high-water mark at the time said map was made was in fact further west than is indicated on said map and survey.

"Fifth. That your petitioners and their predecessors in title have occupied and claimed said property as it now exists, and that their predecessors and grantors have held and possessed said premises adversely to the pretended title (if any) of the city of New York for over 53 years last past, under claim of title in fee, exclusive of any other right, and have occupied and had possession of said premises, and have paid the taxes and assessments thereon, under said claim. And your petitioners further believe that their predecessors in title prior to that time occupied and claimed said premises for a much longer period.

"Sixth. * * * That in or about the year 1853 the then owners of said premises erected thereon a two-story frame building; * * * that at the time said building was erected the tracks of the New York Central & Hudson River Railroad were laid in front of said premises, and the railroad was in operation; that the land in front of said building and underneath the railroad tracks was filled in and formed solid ground, and the said premises were inclosed on all sides with fences; * * * that the building now standing on the said premises is the same building erected thereon in the year 1853, * * * and that since said year 1853 * * * said premises have been protected and inclosed by substantial inclosures, and there has been a continuous occupation and possession of said premises by your petitioners and their predecessors in title under such claim for over 53 years last past before the making of this petition; and that said possession has never been disputed or questioned, and has been peaceable and undisturbed.

"Seventh. Your petitioners claim that they have good title in fee simple to all of said premises as they now exist, and in no way acknowledge that the said city of New York, or any one else, has any interest in or title to said premises or any part thereof.

"Eighth. That your petitioners have consulted with their counsel, * * * and have been advised by him that the said claim of the said vendee that the city of New York has any interest in or title to said premises or any part thereof is wholly without merit, but is an apparent cloud upon their title, which has caused and will cause them irreparable damages."

Wherefore they prayed that:

"A quitclaim deed be authorized and directed to be made, executed, and delivered to your petitioners by the city of New York, which shall dispose of the apparent cloud upon the title of your petitioners, which now unjustly and inequitably exists by reason of the matters hereinbefore set forth."

The sinking fund commissioners declined to grant the petition, and this action was brought against the city for the purpose of quieting title. In its decision the learned Special Term found as a conclusion of law that the petition addressed by the plaintiffs to the commissioners of the sinking fund on the 7th of February, 1907, constituted an admission of title of the city of New York to the premises lying exterior to the original high-water mark, and that the defendant was entitled to judgment in its favor upon the merits; and from the judgment so directed this appeal is taken.

Upon the question of fact there is strong evidence that the property in question lies above the original high-water mark, and so that title thereto never was in the city. In any event, it is clear that the plaintiffs have good title by adverse possession against the city. Harris went into possession under a deed in 1851, and erected a substantial building on the premises in 1853, and inclosed the land with substantial fences, which have existed from that time to the present day. Plaintiffs and their predecessors were in open and undisputed possession, exercising acts of ownership and claiming title against the world, paying taxes and assessments, without claim or question from any

source down to the time of the objections raised by the title company in 1906.

In Barnes v. Light, 116 N. Y. 34, 22 N. E. 441, Vann, J., said: .

"An action of ejectment founded only upon adverse possession can be maintained even against the true owner. * * * A claim of title may be made by acts alone quite as effectively as by the most emphatic assertions. As was said by the Chancellor, when speaking for the Court of Errors, in La Frambois v. Smith, 8 Cow. 589, 603, 18 Am. Dec. 463: 'The actual possession and improvement of the premises, as owners are accustomed to possess and improve their estates, without any ·payment of rent, or recognition of title in another, or disavowal of title in himself, will, in the absence of all other evidence, be sufficient to raise a presumption of his entry and holding as absolute owner, and, unless rebutted by other evidence, will establish the claim of title.' Possession, accompanied by the usual acts of ownership, is presumed to be adverse until shown to be subservient to the title of another."

The subject of title by adverse possession was carefully considered in Baker v. Oakwood, 123 N. Y. 28, 25 N. E. 312, 10 L. R. A. 387. After citing numerous cases, O'Brien, J., concludes:

"These authorities, and others that might be cited, show that title to an estate in land may be acquired by one and lost by another by means of adverse possession. This principle has become a rule of property that cannot now be disturbed without grave injury to titles."

In Timpson v. Mayor, etc., 5 App. Div. 424, 39 N. Y. Supp. 248, this court said:

"The sole remaining question is whether the title to land under water in the Hudson river * * * may, in the absence of statutory restrictions, be acquired by adverse possession and prescription against the city of New York. * * * The defendant's counsel do not distinctly dispute that title by adverse.possession may, as a general proposition, be acquired against the city of New York. That it may is hardly open to doubt. * * * There being no doubt as to the general doctrine, no satisfactory reason has been assigned why land under water in the Hudson river should form an exception to the general rule. * ·* * Our conclusion is that there was nothing to prevent the plaintiffs from acquiring title by adverse user to the bulkhead and wharfage rights for which they sue. We know of no principle, and none has been suggested to us, which prevents the acquisition of title in this manner, unless the circumstances negative the presumption of a grant."

But it is claimed, and the ·learned court below has held, that the application to the sinking fund commissioners in 1907 for a quitclaim deed is such a recognition of superior title in the city as conclusively disposes of the claim to title by adverse possession; and Mayor, etc., v. Mott, 60 Hun, 423, 15 N. Y. Supp. 22, is relied upon as controlling authority to that effect. That was an action· of ejectment to recover possession of certain premises lying outside of the high-water mark of the Hudson river between Fifty-Fourth and Fifty-Fifth streets. Defendants denied the ownership of the plaintiff and alleged an adverse possession. The facts in that case, as appear in the record on the appeal, show that the premises in dispute were filled in in 1853 and 1854. Whatever claim of title by adverse possession there was commenced then. But in 1853 application to the city was made for a grant of land under water. This application was based upon ownership of the upland and the pre-emptive right of such owner to such grant given by statute. The application was granted, but was never consummated. There was a partition proceeding of the lands of claim--·

ants in 1865. No mention was made of this property in such pro-
·ceedings, and the deeds given in consummation thereof bounded the
lands "along the river as it winds and turns." Another similar ap-
plication to the city was made in 1870 for a grant of land under water.
A resolution was adopted by the commissioners granting the applica-
tion, but no grant was actually made or delivered. This second ap-
plication, it will be seen, was 17 years after the first, and, of course,
no title by adverse possession at that time could be claimed. The ac-
tion was brought in 1888, and consequently the statute had not run
since the application of 1870. The opinion of the court must, there-
fore, be read in view of the facts proved. Van Brunt, P. J., said:

"It was established that about 1853 the ancestors of the defendant Mott
filled out the premises in question, and occupied the same down to the time of
the commencement of this action, and this would probably have been sufficient
to establish a title by adverse possession, had there been no recognition of the
superior title of the plaintiff to the land in question."

After alluding to the applications for the grants of land under
·water hereinbefore referred to, the court said:

"Under these circumstances, this application for a water grant upon the
part of Jordan Mott was a clear recognition of the superior title to the land
in plaintiff."

It is clear Mayor v. Mott is distinguished by its facts from the case
·at bar and furnishes no support to the judgment here under review.

Sherman v. Kane, 86 N. Y. 57, is an instructive case. There Mil-
·ler, J., said:

"The contention is that the possession must be 20 years immediately before
·or next before the suit is brought to make out a case within section 388, Code
of Civil Procedure. If this construction is correct, then any lapse of time
without possession would interfere with the meaning of the statute and bar
·a title which had become fixed and established by adverse possession. The
·effect of the position contended for would be that while in 1852 the defend-
ant's title had become perfect by an adverse possession of 48 years, and it
was entitled to the land, its title became forfeited by reason of the premises
being allowed to remain unoccupied for 14 years. If the title had been ac-
quired by grant, such an act could not affect or invalidate it; and, as a title
by adverse possession is equally as strong as one obtained by grant, no reason
exists for making an exception against the latter. A perfect answer, also, to
the position of the learned counsel, is that the city had title by adverse pos-
·session, and that title continued after it became perfect and complete, without
·regard to the interruption of the actual occupation or possession. * * *
The doctrine contended for would preclude the owner of land who had law-
fully acquired title by an adverse possession, under the statute, from a free
and full exercise and enjoyment of the right to use and disposition of the
same, and such a construction is not sustained by authority nor warranted by
any sound principle of law."

So, under the facts in the case at bar, adverse possession, evidenced
by the building of the house and inclosing the property by the fences
and the other acts set forth, certainly began in 1853, and so title was
complete at the expiration of 20 years, to wit, in 1873, and, as said in
the Sherman Case, supra, the title by adverse possession was then
equally as strong as one obtained by grant.

In Greene v. Couse, 127 N. Y. 386, 28 N. E. 15, 13 L. R. A. 206,
24 Am. St. Rep. 458, the question of the effect of negotiations upon
·title was before the court. It said:

"The plaintiff and Alexander Couse, at the time such contract was made, respectively claimed to be the owner of the premises, and for the purposes of the question it may here be assumed that Alexander Couse and his grantor had been in the actual and continuous possession of the premises for 40 or more years, and the plaintiff and those under whom she claimed had not during that period, if ever, been in the actual possession, and that neither the said defendant nor any of his grantors had ever entered into or retained possession of the premises with any permission of or privity with the plaintiff or her predecessors in title. In the absence of any of these relations, the defendant and his grantors owed no duty or obligation to the plaintiff, and was, therefore, at liberty to fortify his title or purchase peace at any price and of whomsoever he chose. If, however, the adverse possession of the defendant's grantor and those under whom he entered and claimed had not ripened into a title at the time the contract of March, 1875, was made, * * * the right to assert the continuance thereafter of such possession to perfect and support title as against the plaintiff would have been defeated by it. * * * The rule in relation to estoppel does not apply 'where, at the time of the purchase, the vendee is in as owner, claiming title, and his entry was not under the vendor.' Glen v. Gibson, 9 Barb. 634, 640. 'Where a man is in possession of land as owner having title, he is at liberty to purchase the land over again as often as claimants shall appear, who are not in possession, and thus quiet such claims and fortify his title, without being estopped from disputing the title of such subsequent vendors, should it afterwards become necessary for him to do so.' Jackson v. Leek, 12 Wend. 105; Bain v. Matteson, 54 N. Y. 666. Even in a consummated purchase, the grantee in fee may purchase in an outstanding title hostile to his grantor and fortify his own defective title. Kenada v. Gardner, 3 Barb. 589."

In the case at bar the title by adverse possession had ripened in 1873, and in 1907 it had been so held for 54 years. The application to the sinking fund commissioners, upon its face, asserted title, and denied any right, title, or interest in the property in the city. It merely asked for a quitclaim deed to satisfy a doubt raised by a title company, and was in no sense an admission of superior title. Irrespective of the nature of the paper and its disclaimers, plaintiffs had a perfect right, their title having ripened, to fortify that title in any way they pleased, and such acts could not destroy that which had become perfected.

The judgment appealed from is erroneous, and should be reversed, and a new trial ordered, with costs and disbursements to the appellant to abide the event. All concur.