In the Matter of the CITY OF NEW YORK, Relative to Acquiring Title to Real Property Required for Harlem River Drive from West 155th Street to Eighth Avenue, in the Borough of Manhattan.

Supreme Court, Special Term, New York County, January 26, 1953.

*Julius B. Sucher* and *Theodore S. Hochstim* for Superintendent of Insurance, claimant.

*T. N. Pfeiffer* and *J. R. Ballin* for Jay Coogan and others, claimants.

*Denis M. Hurley, Corporation Counsel (Samuel K. Handel* of counsel), for City of New York.

EDER, J. The instant proceeding involves a controversy as to title between the Superintendent of Insurance as liquidator of the New York Title and Mortgage Company and Jay Coogan with respect to damage parcels 2, 3, 4 and 5, and a similar conflict exists as to damage parcel 6 between the superintendent and Jay Coogan, Gardiner Coogan, W. Gordon Coogan and Sarah Jessie Coogan, as heirs and descendants of Harriet G. Coogan, who died intestate, on December 18, 1947.

The claims of Jay Coogan originally included damage parcels 2, 3, 4 and 5 but at the trial herein the parties agreed to eliminate damage parcels 4 and 5 title to which is claimed by the city.

Damage parcel 4 is the bed of Exterior Street. Damage parcel 5 relates to a gore of land inshore and outshore the bulkhead line. Claim to this parcel was made by Jay Coogan, the Superintendent of Insurance and the city. The superintendent concedes ownership of this parcel is in the city and withdraws his claim thereto. Such a concession is not made by Jay Coogan.

Damage parcel 6 relates to the bulkhead rights. As to this parcel the four Coogan claimants and the Superintendent of Insurance have filed claims.

In view of the foregoing the determination to be made here is confined to damage parcels 2, 3 and 6 on the issue of title thereto between the Superintendent of Insurance and the Coogans.

As to any issue of title as to damage parcels 4 and 5, to which the city claims title, determination thereof will be made at the time of fixation of the award.

In this proceeding the court has considered the testimony given on examinations before trial heretofore had, which has been offered and received in evidence, and also the agreed statement of facts made by respective counsel in open court.

In 1919, Mrs. Harriet G. Coogan owned all the property here in concern, viz., damage parcels 2, 3, 4, 5 and 6, inclusive. On December 15, 1919, the Eighth Avenue Railroad Company,

a domestic corporation, operating a street railroad in this city, presented its petition to this court pursuant to the appropriate provisions of the Railroad Law for a judgment decreeing that the public use required the condemnation of the property owned by Mrs. Coogan. The petition concluded with the prayer that it be adjudged that the railroad company was entitled to take and hold such property for the public use specified therein upon making compensation therefor and that commissioners of appraisal be appointed to ascertain the compensation to be made to Mrs. Coogan, as owner, for the property so taken, and for such further and other order in the premises as might be just.

Mrs. Coogan made answer to the petition and opposed the requested and desired condemnation. She pleaded as a separate defense that her property was not needed or required for the alleged public use; that if the property then possessed by the railroad company was properly applied and utilized it was adequate to meet the then present and future requirements of the railroad company and that no necessity existed for the railroad company acquiring her property or for an order for its condemnation, and prayed that the said petition be dismissed.

After due consideration, the court, on October 1, 1920, made an order adjudging that condemnation of said property was required by the company for the better management, maintenance and operation of its said railroad, and was necessary for the public use, and that the company was entitled to take and hold said property for the specified public use upon making compensation therefor.

Commissioners of appraisal were appointed by the court to ascertain and appraise the compensation to be made to Mrs. Coogan for the real property, rights, interests, uses or easements owned by her, to be taken for said public use. The commissioners took testimony with respect thereto and filed their report and opinion on May 17, 1921, and thereafter a final order of condemnation was made by this court on June 27, 1921, wherein the report of the commissioners as to the compensation to be made was confirmed.

The said final order further directed that upon payment being made by the railroad company to Mrs. Coogan, the title to the said property, and all rights, interests, uses or easements in connection therewith, owned by her, should be deemed vested in the company for the public use set forth in the petition.

The petition set forth that the company was formed under the General Railroad Act, chapter 140 of the Laws of 1850, as amended by chapters 140 and 282 of the Laws of 1854, for the purpose of constructing, maintaining and operating a railroad for public use along certain designated street surface areas and that the railroad was duly constructed and completed by the company and for many years prior to its application for condemnation was maintained and operated by the company and its lessee.

The petition averred that the public use for which said property was required was occasioned by the need of a change in the motive power of transportation from the use of horses and horsecars to the use of underground electric power with electric cars, and the need of the use of the Coogan property for erecting and maintaining thereon a power plant for the manufacture of electricity for power and lighting, a machine shop and a carbarn for the housing, storage, maintenance and repair of cars, and the storage of machinery, materials and equipment for the better management, maintenance and operation of the railroad.

The petition further alleged that it was the company's intention in good faith to use the said property for the purpose of its railroad and to complete the work of improvement for which the property was sought to be condemned.

The said condemnation proceeding was instituted by the railroad company pursuant to the provisions of the Railroad Law in effect during the 1919 condemnation and which are embodied in subdivision 2 of section 8 and section 17 of the present Railroad Law.

Section 8 provides that in addition to the powers given by the General and Stock Corporation Laws, every railroad corporation shall have power to acquire real property for certain specified purposes, and by subdivision 2 thereof a railroad corporation is authorized: " To take and hold such voluntary grants of real estate and other property as shall be made to it to aid in the construction, maintenance and accommodation of its railroad; and to acquire by condemnation such real estate and property as may be necessary for such construction, maintenance and accommodation in the manner provided by law, *but the real property acquired by condemnation shall be held and used only for the purposes of the corporation during the continuance of the corporate existence.*" (Emphasis supplied.)

Section 17 provides for acquisition of title to real property

and to additions, betterments and facilities thereof and requires that the acquisition shall be for a public use, and that it may be acquired by condemnation. So far as here relevant, it provides: "All real property required by any railroad corporation for the purpose of its incorporation or for any purpose stated in this chapter shall be deemed to be required for a public use, and may be acquired by such corporation."

It is thus quite clear from the language of these enactments that the acquisition of such real property by a railroad company, by condemnation, shall be an acquisition for a public use only and shall not be an acquisition in fee simple. Subdivision 2 of said section 8 clearly so discloses: "but the real property acquired by condemnation shall be held and used only for the purposes of the corporation during the continuance of the corporate existence."

And as section 17 pointedly states, all real property acquired by condemnation for the purpose of the railroad shall be deemed to be required for a public use.

Nowhere in these provisions is there anything to the effect that where title is sought to be acquired by condemnation the railroad company is authorized to obtain a title in fee simple, and otherwise than for a public use. Nothing therein indicates a legislative intent that the railroad company may, by condemnation, acquire a title in fee simple, for a private use.

Indeed, the petition of the railroad company for the condemnation of the property contains no allegation that it sought to acquire, by condemnation, a title in fee simple, and other than for a public use. Only in the prayer of the petition is there such a statement. Even the final order of condemnation contains no vesting of a title in fee simple or a title unconnected with a public use. The final order distinctly recites and declares that the title which is vested in the railroad company is "for the public use."

It is an established canon of the law of eminent domain that though the Legislature may determine the extent of the title to be acquired by a railroad corporation by condemnation, unless express authorization to take a fee is given, the railroad company acquires title only in the nature of an easement; that the provisions of such an act will be rigidly construed, and the quantum of the title to be taken will not be extended by implication (*Crouch* v. *State of New York*, 218 App. Div. 356; *Hayner* v. *State of New York*, 193 Misc. 74). These citations are comparable cases. In the *Crouch* case, the court said

(p. 361): "The rule is that when private property is taken in the exercise of the right of eminent domain, particularly by a private corporation, the taking is limited to the reasonable necessities of the case, to carry out the purpose for which permission to take is given, so far as the owners of the property are concerned."

The court held that the railroad company, in acquiring, by condemnation, such right to use the land, for a public purpose, takes something less than a fee, unless definite authority is given to acquire a fee interest in the land.

It is the established law (*Hudson & Manhattan R. R. Co.* v. *Wendel,* 193 N. Y. 166, 177-179).

The *Crouch* case further held that the condemnation under the statute did not authorize the acquisition of a fee by the railroad company, and that the condemnation thereunder left a reversionary interest in the owner entitling him to compensation where the property is abandoned by the railroad company and appropriated to a new public purpose.

In the instant case, therefore, the Eighth Avenue Railroad Company did not, by said condemnation proceeding, acquire a fee, but an easement only was taken in the property in question.

Counsel for the Superintendent of Insurance has cited and quoted from *Kip* v. *New York Central R. R. Co.* (140 Misc. 62, affd. 236 App. Div. 654, affd. 260 N. Y. 692, certiorari denied 290 U. S. 636), as an indication that by the enactment of subdivision 2 of section 8, and section 17 of the Railroad Law, the Legislature must have contemplated that the railroad company could obtain title to the premises in fee simple absolute, despite the total absence from these provisions of any such intent and the employment of language which indicates a rather converse intention.

The *Kip* case is inapplicable in point of fact and law. As is apparent from a reading of the opinion, it was decided on its own particular facts in no way comparable with those in the case at bar. It is, perhaps, not inappropriate to comment that it was not a condemnation proceeding; the action was for an accounting and for the appointment of a receiver of rents and profits due from the defendant 277 Park Avenue Corporation under its lease with the other defendants. It involved dissimilar enactments, not comparable with the provisions of the Railroad Law here involved.

The statutes there discussed and considered were of a *special* character; they *expressly provided* that the railroad company,

upon instituting condemnation proceedings for the land required, should be seized and possessed of the "*fee simple*" or "*in fee*" thereof. No such special rights and powers are contained in subdivision 2 of section 8, and section 17 of the Railroad Law as it existed at the time of the institution of the 1919 condemnation proceeding by the Eighth Avenue Railroad Company or at the time the final order was made therein on June 27, 1921, and, indeed, even as it exists at the present time.

In fact, counsel for the Superintendent of Insurance acknowledges he has been unable to find any prior decision regarding the statute here under consideration and states: "No cases are cited with reference to the quantum of title obtained by the railroad, as none have been found arising under the statute under which this condemnation took place."

The *Kip* case is, obviously, of no aid and, for the reasons mentioned, without application or effect.

Nor has counsel for the Coogan claimants cited any case directly construing and interpreting the enactments in question.

The determination to be here made appears to be precedential in character.

The railroad company here apparently was under the impression that it acquired, in said condemnation proceeding, not an easement, but a title in fee, for on or about October 31, 1921, it executed and delivered a mortgage on the property in the sum of $280,000, as owner of title in fee simple absolute thereof, to the Columbia Trust Company, the proceeds of which, it was therein set forth, were being used by it to pay Mrs. Coogan as compensation for the property acquired by the railroad company from her in the condemnation proceeding, which mortgage was recorded on November 2, 1921, in the Register's office of New York County. On May 3, 1932, the mortgage was assigned to the New York Title & Mortgage Company, which had insured the railroad company's title at the time the mortgage was given, and the assignment was recorded in said Register's office on May 5, 1932. The Superintendent of Insurance, as the liquidator of the title and mortgage company, thereafter became the owner and holder thereof.

The railroad company, seemingly under the belief that it was the fee owner of the property, later conveyed it to the Railways Realty Corporation, said to be a subsidiary, by deed dated December 13, 1926, and recorded on that day in the New York County Register's office.

Of course, the belief of the railroad company and of its subsidiary, the Railways Realty Corporation, that each was vested with a title in fee to the property is of no moment so far as the actual legal effect is concerned. The railroad company could give no better title than it acquired or could acquire under the statute, and if it could only acquire an easement thereunder, that is all it could convey. Likewise, the Railways Realty Corporation, as vendee, could acquire no more under the conveyance, as a matter of law, regardless of what the deed recited. Nor would it have altered the legal situation with respect thereto if the judgment of mortgage foreclosure, alluded to post, had decreed a title in fee; this would have been an extra-judicial act beyond the power of the court and would be of no effect.

When foreclosure of the mortgage was contemplated, this feature was given consideration and there was doubt that a judgment of foreclosure of the mortgage would wipe out the fee interest and any other interests and rights of Mrs. Coogan in the property other than the easement. To buttress the questionable effect of the mortgage on the fee and to overcome this obstacle, the Superintendent of Insurance, on or about December 18, 1936, purchased at public auction, from the City of New York, tax liens affecting said property, and thereafter, upon obtaining transfer of the tax liens, instituted an action in this court to foreclose the same, setting up in the complaint two causes of action, the foreclosure of the tax lien, as the first cause of action, and the foreclosure of said mortgage, as the second cause of action.

In that action the property sought to be foreclosed was described in the complaint, and constitutes damage parcels 2, 3, 4, 5, being the upland. It appears that damage parcel 6, being the bulkhead rights, and which were included in the railroad easement which was acquired, were not included in the first cause of action affecting the tax lien. It is stated in the Coogan brief that this tax lien did not include the bulkhead rights and that the foreclosure of the tax lien affected damage parcels 2 and 3 only. This appears to be so.

The Superintendent of Insurance never foreclosed any tax lien on the bulkhead rights. Thus the bulkhead rights were not affected by the mortgage foreclosure and were not cut off thereby, since the mortgage was only a mortgage on the easement and not on the fee, and, also, were not cut off by the tax lien foreclosure.

Whatever the reason, the bulkhead rights were not included, and hence were not affected by the foreclosure action and the judgment of foreclosure on either cause of action. In that action Mrs. Coogan appeared by her attorneys, Messrs. Milbank, Tweed & Hope, and filed a notice of appearance, but did not interpose an answer to the complaint.

Judgment of foreclosure and sale was duly signed on January 13, 1941, and filed on January 23, 1941; by said judgment it was adjudged that the transfer of the tax lien held by the Superintendent of Insurance, as liquidator of the New York Title & Mortgage Company, was a valid and subsisting tax lien and that the lien thereof on the premises described in the complaint and supplemental complaint was superior to the respective liens of the State and City of New York as therein more particularly set forth; and said judgment of foreclosure forever barred and foreclosed Mrs. Coogan, and all persons claiming under her, of all right, claim, lien, title, interest and equity of redemption in the said liened and mortgaged premises, and each and every part thereof.

The premises were purchased at the sale by the Superintendent of Insurance, as such liquidator of the New York Title & Mortgage Company, and a referee's deed was delivered to him on March 5, 1941, and recorded on March 13, 1941.

Excluding the matter of the legal effect of the mortgage on the fee, the foreclosure of the tax lien wiped out the title of Mrs. Coogan in the fee as to damage parcels 2 and 3 and every right and interest she had therein and in the property; and if this is so, then her heirs and descendants, Jay Coogan, Gardiner Coogan, W. Gordon Coogan and Sarah Jessie Coogan, are likewise barred.

Indeed, this is conceded by counsel for said claimants. He contends, however, that if anyone but the Superintendent of Insurance had purchased the tax lien such bar would exist, but that his purchase thereof was a device or method to avoid obligation to pay the taxes which were required to be paid upon completing the foreclosure, and for that reason submits the tax lien title should be held invalid.

The court views this as an untenable contention. It fails to see that this constitutes a legal impediment to the right of the Superintendent of Insurance to purchase the tax lien, as he did, at public auction, and to enforce it and acquire all legal rights thereunder as any other purchaser (*Ten Eyck* v. *Craig*, 62 N. Y. 406, 421-422; *Cornell* v. *Woodruff*, 77 N. Y. 203, 207).

Counsel for the Coogan claimants submits that the Superintendent of Insurance, as mortgagee in possession, became a trustee for the mortgagor and was under a duty to pay the taxes from the rents and income of the property and could not purchase the tax lien and avail himself of foreclosure of the mortgage or tax lien and of the attendant rights and benefits thereof.

It is not claimed that the rents and income of the property were sufficient to pay the taxes. Rather it appears they were insufficient. It is therefore difficult to perceive how any trust could here result for it appears not only that the rents and income from the property were insufficient to pay the taxes but that the moneys used by the superintendent to purchase the tax lien were moneys separate and apart from the moneys he received from the rents and profits of the premises.

Thus no trust was violated by the superintendent's acquisition and enforcement of the tax lien. He was, in the factual situation shown, fully within his legal rights in acting as he did (*Ten Eyck* and *Cornell* cases, *supra*); and, upon the factual situation here present the *Ten Eyck* case, for the reasons stated, is of no aid to the Coogan claimants, but is, rather authority in support of the right of the superintendent to acquire and enforce the tax lien.

Furthermore, assuming, *arguendo*, the existence of a trust relationship, it does not alter the situation for the Coogans were not the mortgagor and therefore not the beneficiary of the trust, and, in consequence, are not the proper parties and are without standing to raise this question.

The court notes that counsel for the Coogan claimants has not cited any case which supports their assertion to the contrary upon the state of the record present here.

Moreover, such a claim, assuming, *arguendo*, it had any merit, should have been interposed as a defense to the foreclosure action, and not having been interposed, cannot be made now.

The impression is gained that it is an afterthought, now conceived and advanced in an effort to avoid the effect and consequences of the tax lien foreclosure.

The judgment of foreclosure and sale under the tax lien completely obliterated every interest of Mrs. Coogan in the fee, and otherwise, which she possessed with respect to damage parcels 2 and 3, and the title thereto is in the Superintendent of Insurance, acquired under the referee's deed.

Aside from any of the matters above alluded to, any claim of title in the Coogan heirs and descendants is shown to be without substance under the superintendent's claim of adverse possession. Ever since the final order of condemnation was made under the Railroad Law on the petition of the railroad company, the company, its subsidiary, the Railways Realty Corporation, its vendee, and the Superintendent of Insurance, as fee owner under the referee's deed, have been, at divers times, but nonetheless, from the very outset, except for a short period, mentioned, post, in open and notorious, uninterrupted, exclusive and unmolested and continued possession and use of the property, exercising rights of fee ownership, and also of a mortgagee in possession, with the knowledge of Mrs. Coogan and of her heirs and descendants, who have at no time questioned or in the slightest degree challenged such adverse possession and exercise of fee title ownership thereunder.

The evidence establishes hostile possession under claim of right, open and notorious, exclusive, continuous and uninterrupted for a period of over fifteen years (Civ. Prac. Act, § 35). "Adverse possession, although not a favored method of procuring title, is a recognized one. It is a necessary means of clearing disputed titles and the courts adopt it and enforce it, because, when adverse possession is carefully and fully proven, it is a means of settling disputed titles and this is desirable." (*Belotti* v. *Bickhardt,* 228 N. Y. 296, 308.)

The established rule is that all that is necessary in order to make an adverse possession effectual for the statutory period by successive periods is that such possession be continued by an unbroken chain of privity between the adverse possessors (*Belotti* case, *supra,* p. 306; Tyler on Adverse Enjoyment, p. 912). It is the situation in the case at bar.

The final order of condemnation was made on the petition of the railroad company on June 27, 1921. On October 31, 1921, as owner in fee, the railroad company, as mentioned, executed and delivered to the Columbia Trust Company, a mortgage on the property in the sum of $280,000, the proceeds of which it was therein stated were being used by the railroad company to pay Mrs. Coogan as compensation or price for the property acquired by it from her, and which mortgage, as stated, was recorded in the register's office on November 2, 1921.

By the execution, delivery and recording of said mortgage it thereby openly, notoriously and publicly proclaimed its full fee ownership in open hostility to the entire world.

It then continued in possession as an owner in fee, exercising rights of ownership in fee, open and notorious, exclusive and continuous and uninterrupted, until December 13, 1926, when as owner in fee it conveyed by deed a fee title to the property to Railways Realty Corporation, which was recorded in the office of the Register of New York County, on that day.

Thus the railroad company's adverse possession continued without challenge for a period of a little over five years, viz., from October 31, 1921, to December 13, 1926, when it conveyed a fee title to the property to said Railways Realty Corporation.

The Railways Realty Corporation thereafter continued in possession as owner in fee and exercised the rights of an owner in fee, open and notorious, exclusive and continuous, without interruption, from the date of conveyance, i.e., December 13, 1926, to March 5, 1941, when the Superintendent of Insurance, as liquidator of the New York Title & Mortgage Company, received the deed from the referee in the foreclosure action, as mentioned.

Thus the adverse possession of Railways Realty Corporation, the vendee of the railroad company, continued without challenge for a period of fourteen years and three months, viz., from December 13, 1926, to March 5, 1941, an uninterrupted and unbroken chain of privity between such adverse possessors of over nineteen years and close to twenty years.

Throughout all this period, Mrs. Coogan, with knowledge of the facts — and which were matters of public record, for the condemnation proceeding, the deeds and mortgage were filed and recorded in the public offices — never once challenged such adverse possession; she brought no proceedings or action of any kind to oust the adverse possessors; she brought no proceedings or action to declare the deeds and mortgage invalid as to the fee and to remove them as a cloud on her title; she brought no action or proceeding of any kind to quiet title.

Nor did she in the foreclosure action interpose any such defense or make any such claim or seek any such relief. Rather she only appeared in the action, by attorneys, but interposed no answer to the complaint or supplemental complaint, and interposed no such claim or defense though she had full and ample opportunity to do so.

Again, when on March 5, 1941, the Superintendent of Insurance, as said liquidator of the New York Title & Mortgage Company, received a deed to the property from the referee in the foreclosure suit, which he recorded, and took possession of the property and exercised over it the rights of ownership in

fee, Mrs. Coogan did not challenge the validity of his title or possession by way of formal legal action or otherwise.

Further, on May 31, 1935, the railroad company ceased operations and was not in possession of the property thereafter. Even then Mrs. Coogan did not take any steps whatever to take possession, by re-entry, by ejectment, or otherwise.

In June, 1936, the Superintendent of Insurance, as mentioned liquidator of the New York Title & Mortgage Company, took over the property as a mortgagee in possession, and under an assignment of rents from the Railways Realty Corporation, with no challenge by Mrs. Coogan as to the legality of his right to do so and to so act, and he continued in such possession, openly and notoriously, except for a period of about three years, from 1943, to 1946, when the city treasurer, as receiver, collected the rents of the property and took over because of default in payment of real estate taxes, but during all this time the Superintendent of Insurance was considered as fee owner of the property. The temporary receivership that followed the default in the payment of the real estate taxes did not suspend the operation of any period of adverse possession running in favor of the Superintendent of Insurance.

Furthermore, from March 5, 1941, to April 2, 1952, when title to the property vested in the City of New York, in this proceeding, a period of over eleven years, neither Mrs. Coogan, who died in 1947, nor her heirs and descendants, the claimants, ever challenged by action or took any steps to challenge the validity of the mortgage as to the fee.

Thus, for almost thirty-one years, viz., from October 31, 1921, to April 2, 1952, the adverse possession of the railroad company, as fee owner, the Railways Realty Corporation, as fee owner, and the Superintendent of Insurance as liquidator, and as mortgagee in possession, as mentioned, and as owner in fee of the property under the referee's deed, has been open and notorious, exclusive, continuous and unchallenged by Mrs. Coogan during her lifetime, or by her heirs and descendants, until a claim of title was made in this condemnation proceeding on April 24, 1952, after the date of the institution of said proceeding.

It is appropriate to note too, that after Mrs. Coogan's death in 1947, intestate, in administration proceedings in the Surrogate's Court, this property, damage parcels 2 to 6, inclusive, was not included in the schedules as assets of Mrs. Coogan, and hence no transfer tax was paid with respect thereto.

The described situations and the circumstances alluded to *supra* are highly relevant and vitally material factors to be considered on the issue of claim of title by adverse possession (*Baker* v. *Duff*, 136 App. Div. 13, affd. 202 N. Y. 570).

Mrs. Coogan, as true owner, was disseized when actual possession was taken by the railroad company (*Howell* v. *Garlington*, 270 S. W. 269 [Tex.]), for adverse possession must begin with disseizin of the owner (*Smith* v. *Alaoma Lbr. Co.*, 73 Ore. 1; *Houck* v. *Houck*, 133 Ore. 78). The statute begins to operate and run in favor of the disseizor as against the true owner from the date of such actual and adverse possession by the disseizor, and if actual and adverse possession of the disseizor continues for the statutory period and is peaceable, then such adverse and peaceable possession for such period of time gives to the disseizor perfect title to the land claimed by him (*Howell* v. *Garlington, supra*).

Undisputed evidence of adverse possession for the statutory period creates a prima facie case in favor of the adverse claimant entitling him to judgment, and the burden is on the true owner to establish the converse, if he can. No such attempt was made here by Mrs. Coogan or by Jay Coogan or by any of the Coogans.

The court finds that the superintendent's claim of title by adverse possession is established, and it is sustained, and it is the court's determination that title to damage parcels 2 and 3 is in the Superintendent of Insurance, as liquidator of the New York Title & Mortgage Company, and the claim of Jay Coogan to the converse is dismissed.

Adverting now to damage parcel 6, the bulkhead rights, this was not included in the mentioned tax lien foreclosure action. The Superintendent of Insurance, as said liquidator of said title and mortgage company, only foreclosed for the taxes levied on the upland.

The superintendent contends, however, that his claim of title to damage parcel 6, under the doctrine of title by adverse possession, is similar to the situation and condition existing with regard to damage parcels 2 and 3; that the exercise of the rights of an owner in fee is similarly present here with regard to the bulkhead rights; open and notorious, undisturbed and unmolested, continuous, exclusive possession, with full knowledge of same by Mrs. Coogan and by her heirs and descendants, with no challenge thereof by her or by them; hence title must be held to be in the Superintendent of Insur-

ance, by adverse possession, and that the claim by the Coogan heirs of title to the bulkhead rights is devoid of substance and is legally untenable. The court finds that the Superintendent of Insurance has sustained the claim of title by adverse possession with respect to the bulkhead rights, damage parcel 6.

The rule with respect to a claim of title by adverse possession as to uplands applies as well to a claim of title to the bulkhead rights. In *Timpson* v. *Mayor of the City of New York* (5 App. Div. 424), it was held that title to rights of wharfage and cranage may be acquired by adverse possession. The court said (p. 431): " Our conclusion is that there was nothing to prevent the plaintiffs from acquiring title by adverse user to the bulkhead and wharfage rights for which they sue. We know of no principle, and none has been suggested to us, which prevents the acquisition of title in this manner, unless the circumstances negative the presumption of a grant." (See, also, *Knapp* v. *City of New York*, 140 App. Div. 289.)

It is the ultimate determination of the court that the claim of the Superintendent of Insurance of title to the bulkhead rights, damage parcel 6, is a valid claim and it is sustained, and the claim of the Coogans to the contrary is dismissed.

The court will entertain proof as to the quantum of the award. Settle order.